H.A. TRUE, Jr. and Jean D. True, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Henry A. TRUE, III and Karen S. True, Plaintiffs,

v.

UNITED STATES of America, Defendant.

David L. TRUE and Melanie A. True, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Donald G. HATTEN and Tamma T. Hatten, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Diemer D. TRUE and Susan L. True, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Nos. C82–052–K to C82–056–K.

United States District Court, D. Wyoming.

Jan. 21, 1986.

Order on Directed Verdict Feb. 14, 1986.

See also, D.C., 603 F.Supp. 1370.

R. Stanley Lowe, Richard E. Day, Casper, Wyo., Claude M. Maer, Jr. and Fred M. Winner, Denver, Colo., and Ronald M. Morris, Casper, Wyo., for plaintiffs.

Dennis Donohue and Michael Lichtenberg, Trial Attys., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## ORDER RULING ON MOTIONS FOR SUMMARY JUDGMENT ON THE CONSTRUCTIVE RECEIPT ISSUE AND THE PERCENTAGE DEPLETION ISSUE

KERR, District Judge.

The above-entitled matter having come on regularly for hearing before the Court on plaintiffs' motion for summary judgment and defendant's cross-motion for summary judgment; plaintiffs appearing by and through their counsel, Richard E. Day, Fred M. Winner, Claude M. Maer, Jr., R. Stanley Lowe and Ronald M. Morris, and the defendant appearing by and through its counsel, Dennis Donohue and Michael Lichtenberg, Tax Division, United States Department of Justice, and the Court having heard the arguments of counsel and having fully and carefully reviewed the motions, briefs, stipulation of facts, exhibits and all matters pertinent thereto, and being fully advised in the premises, FINDS:

This case arises as the plaintiffs, taxpayers, seek a tax refund for the years 1973, 1974, and 1975. Each of the separate taxpayer cases have been consolidated because the facts, issues and legal questions are the same in each case with certain limited exceptions. The motion for summary judgment considered here is one of the exceptions in that it involves (1) only two of the plaintiffs, Diemer D. True and Henry A. True, III and whether in 1975 these plaintiffs constructively received GMOR pay-

ments in the amount of $96,000.00 and $47,-487.00 respectively; and, (2) whether the bonuses and GMOR payments received by all of the plaintiffs (except H.A. True, Jr. and Jean D. True, who did not receive such payments) were properly treated by them as bonuses and advanced royalties subject to percentage depletion.

It appears to the Court that there is no dispute as to any material fact with respect to these issues and, therefore, the same are ripe for summary judgment. This Court has jurisdiction pursuant to 28 U.S.C. § 1346(a)(1).

True Oil Company is a general partnership organized under the Uniform Partnership Act of Wyoming and is engaged in the exploration for and production of oil and gas in the Rocky Mountain area. Prior to August 1, 1973, the partnership interests of True Oil Company were owned by H.A. True, Jr. (95%) and Jean D. True (5%). Effective August 1, 1973, H.A. True, Jr. transferred an 8% partnership interest in True Oil Company to each of his four adult children. From August 1, 1973 to 1984, the partnership interests in True Oil Company have been owned as follows:

| | |
|---|---|
| H.A. True, Jr. | 63.0% |
| Jean D. True | 5.0% |
| Tamma T. Hatten | 8.0% |
| Henry A. True, III | 8.0% |
| Diemer D. True | 8.0% |
| David L. True | 8.0% |

During the years 1973, 1974 and 1975, True Oil Company made payments pursuant to the GMOR agreements to unrelated parties and to the four adult children of H.A. True, Jr. and Jean D. True. This motion for summary judgment involves certain tax aspects of the so-called GMOR payments to the adult children.

This case came on for trial commencing October 23, 1985, and, following the closing of the evidence, the jury answered special verdicts posed by the Court. One of these special verdicts is decisive of the percentage depletion issue.

*Constructive Receipt Issue*

■ In 1975, plaintiffs Diemer D. True (Diemer) and Henry A. True, III (Hank) won oil and gas leases from the State of Wyoming and the United States Government, respectively, in simultaneous drawings. On December 29, 1975, both Diemer and Hank entered into GMOR agreements in which they agreed to transfer to True Oil Company their respective leases in exchange for certain payments specified in the agreements. On December 31, 1975, both Diemer and Hank executed assignments of the respective leases to True Oil Company. Following proper and accepted accounting practice, True Oil Company accrued as deductions the obligation to make such payments in its partnership income tax return for the year 1975.

The customary procedure followed by True Oil Company in the acquisition of state and federal oil and gas leases by GMOR agreements was to make payment after all of the paperwork had been completed and the assignment of the specific lease(s) forwarded to the government agency for approval and recording. This procedure normally would take anywhere from one to six weeks. Consequently, for a transaction entered into on December 29, 1975, payment would not normally be made until one to six weeks later in the regular course of business.

On February 4, 1976, True Oil Company, in the regular course of business, issued checks to Diemer and Hank in payment of the GMOR obligations incurred by True Oil Company on December 29, 1975. (See photocopies of checks attached to accountant's affidavit) Following proper and accepted accounting practice, Diemer and Hank, utilizing the cash basis method, included such GMOR payments in their respective taxable incomes for the year 1976.

In a Revenue agent's report dated June 12, 1979, the Internal Revenue Service stated incorrectly that the checks were issued to Diemer and Hank on December 31, 1975 and determined that there was constructive receipt of these payments in 1975. The Court disagrees with this determination

and finds that the GMOR payments should be included in the taxable incomes of Diemer and Hank in 1976, as they did not constructively receive such payments in 1975.

The Internal Revenue Service argues that since Diemer and Hank were partners in True Oil Company and the employees of True Oil Company kept records for them, the payments were within the "control and disposition" of Diemer and Hank. However, the Internal Revenue Service fails to take into account the fact that True Oil Company is a substantial business organization with several hundred employees divided into several departments and related companies. As of the close of 1975, True Oil Company accrued on its books several hundred liabilities which, in the normal course of business, were not actually paid by check until one week to several months later in 1976. Most of these obligations and subsequent payments were to unrelated parties. It seems apparent that the payments made to Diemer and Hank were made in the normal course of business and they were treated no differently from any other person to whom True Oil Company owed money. Under these circumstances, the Court is unable to find that there was any constructive receipt by Diemer and Hank in 1975.

In *Avery v. Commissioner*, 292 U.S. 210, 54 S.Ct. 674, 78 L.Ed. 1216 (1934), the Supreme Court interpreted the applicable regulations, which are now found in Treas. Reg. § 1.451–2(b), which were originally promulgated in 1921 and have remained substantially unchanged since that date. Relying on the customary established practice of the payor company, the Court held that a dividend check written on December 31, but not delivered to the payee until the following year, was not constructively received by the payee. This was held to be true despite the fact that the payee was the president and a stockholder of the payor company. The *Avery* case seems to be on all fours with the instant case, since it is undisputed that the policy of True Oil Company in the regular conduct of its business was not to make payment for a lease acquired on a GMOR until all the paperwork

had been completed and the lease assignment filed with the appropriate governmental agency for approval and recording, a procedure normally taking one to six weeks.

This Court agrees with the interpretation of the regulations in the *Avery* case and holds that plaintiffs Diemer D. True and Henry A. True, III did not constructively receive the GMOR payments in 1975 for the reasons that under company policy and in the ordinary course of the company business, GMOR payments were made both to unrelated parties and family members only after the necessary paperwork had been completed and the assignments of the leases filed with the appropriate governmental agency. Plaintiffs Diemer and Hank were treated no differently from any other creditor of True Oil Company in the handling of these payments. Plaintiffs' motion for summary judgment on the constructive receipt issue should be granted.

*Percentage Depletion Issue*

■ This issue involves the individual income tax returns of the four adult children of H.A. True, Jr. and Jean D. True, referred to as taxpayers. The taxpayers acquired state and federal oil and gas leases in simultaneous drawings and transferred a number of them to True Oil Company in exchange for GMOR payments pursuant to GMOR agreements. Most of these agreements provided for the payment of a bonus and the payment of a first, second, and sometimes a third GMOR under certain circumstances. In filing their income tax returns for the years 1973 and 1974, the taxpayers claimed a deduction for percentage depletion on all of these payments which the Internal Revenue Service disallowed.

It has long been held that bonuses and advanced royalties paid in consideration for the transfer of an oil and gas lease is entitled to deduct percentage depletion on these payments. *Sunray Oil Co. v. Commissioner*, 147 F.2d 962 (10th Cir.1945).

The government earlier in this litigation conceded that the GMOR payments made to unrelated parties were properly treated as advanced royalties and deductible by True Oil Company in the year of payment. The jury considered all of the bonus and GMOR payments made to the family members, including taxpayers in this summary judgment issue, and found that the GMOR payments made to family members were entered into for valid and substantial business purposes having economic reality. As such, the bonuses and GMOR payments to taxpayers are properly treated as advanced royalties subject to percentage depletion, and the Court so finds. Plaintiffs' motion for summary judgment on the percentage depletion issue should be granted.

NOW, THEREFORE, IT IS

ORDERED that plaintiffs' motion for summary judgment on the constructive dividend issue and the percentage depletion issue be, and the same is, hereby granted; it is

FURTHER ORDERED that defendant's cross-motion for summary judgment on these issues be, and the same is, hereby denied.

## ORDER ON DIRECTED VERDICT ON THE OIL PAYMENT/EQUIPMENT ISSUE (WITH FINDINGS)

This matter came on for trial before a jury on October 23, 1985 and involved six separate issues. Prior to trial the parties suggested, and the Court agreed, that because of the complexity of this action, each issue would be tried sequentially in series and the jury would render its verdict by answering special interrogatories propounded for each of the six issues. The procedure agreed upon was that counsel would make general opening statements covering all issues at the commencement of the trial, and specific opening statements would be made at the beginning of each separate issue. The special interrogatories would be handed to the jury at the commencement of the taking of testimony for each of the issues. At the end of the testimony for each issue, the instructions would be read to the jury by the Court and copies handed to the jury at that time. The jury would be instructed not to deliberate until the conclusion of all testimony on all of the issues. At the end of each issue, counsel would be given an opportunity for summation as to the particular issue. At the close of all evidence on all issues, counsel would be allowed to make final closing statements and arguments.

■ The third issue to be tried was originally denominated by the parties as the "Oil Payment Issue" but was sometimes referred to as the "Equipment Issue." Briefly, the question to be decided was whether certain oil field equipment, such as casing, tubing, pumps, flow lines, treaters, separators, tanks and other similar equipment customarily installed on an oil or gas well which had been supplied to True Oil Company by Toolpushers Supply Company in exchange for oil payments, was for exploration and development (as plaintiffs contend) or was primarily related to production (as defendant contends).

Sometime prior to the trial, plaintiffs filed a motion for summary judgment on this issue contending that there was no genuine issue as to any material fact and that plaintiffs were entitled to judgment on the issue as a matter of law. The question was briefed by the parties, and, after consideration, the Court denied plaintiffs' motion. After hearing the opening statements and the testimony of the witnesses and after considering the evidence offered during the trial of this issue, the Court was of the opinion that there was no genuine issue as to material facts and that plaintiffs were entitled to judgment on the issue as a matter of law, and, therefore, granted plaintiffs' motion for a directed verdict on the equipment issue. Accordingly, the Court herein enters its Order on Directed Verdict on the Oil Payment/Equipment Issue and finds as follows:

Production payments or oil payments have long been utilized in the financing of the oil and gas industry. Prior to the enactment of 26 U.S.C. § 636 these financing

arrangements took many forms. Development carve-outs were specifically recognized by the Internal Revenue Service in 1941 pursuant to G.C.M. 22730, 1941–1 C.B. 214. Therein it was stated that:

> ... If the driller or equipment dealer is making an investment by which he acquires an economic interest in oil and gas in place, expenditures made by him represent capital expenditures returnable tax-free through the depletion allowance rather than by way of expense deduction, and the oil payment rights acquired do not represent payment in property for services rendered or supplies furnished. Similarly, one who, in return for an oil payment right, furnishes money which the lessee is pledged to use in developing the property would be regarded as making an investment representing an addition to the reservoir of capital investments in oil and gas in place.... Such a transaction, involving a pledge to use the money furnished in developing the property, is distinguishable from a sale the proceeds of which are unqualifiedly received by the seller. *Id.* at 221–222.

The enactment of § 636 was to prevent abuses of the tax laws by the use of certain types of sharing arrangements. See S.REP. No. 552, 91st Cong., 1st Sess. 182 (1969); *Commissioner v. P.G. Lake*, 356 U.S. 964, 78 S.Ct. 991, 2 L.Ed.2d 1071 (1958).

As the Court previously stated in its Summary Judgment Order, dated April 3, 1985, the effect of § 636(a) is to treat carved-out production payments as mortgage loans and not economic interests. The owner of the operating interest would, therefore, be required to include as ordinary income the proceeds attributable to the production payments, even though the proceeds would be paid directly to the owner of the production payment.

There is an exception to the mortgage loan treatment of § 636(a) with regard to qualified development production payments. The exception in essence provides that mortgage loan treatment does not apply to production payments carved out for exploration and development of a mineral property to the extent that gross income would not be realized by the transferor of the production payment under the law existing at the time § 636 was enacted. This provision treats development carve-outs as economic interests as they would have been treated prior to the enactment of § 636.

In order to qualify as an economic interest with the attendant tax treatment, the carve-out must be given in exchange for either cash pledged for development or exploration or equipment used in development and/or exploration. Additionally, the party receiving the production payment in exchange for the contribution of equipment or cash pledged for development must look *solely* to the proceeds of the oil and gas production on the property for repayment of the contributions. *Thomas v. Perkins*, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324 (1937); 26 C.F.R. § 1.636–3(a)(1).

The rationale for limiting a development carve-out to the exploration and development stage of a mineral property is predicated upon the concept of a true sharing arrangement. Such an arrangement revolves around the "pool of capital" where each contributor shares in the risk of the repayment of the investment. Commentators have stated:

> It is important to observe that the rules stated above [for a true development carve out] are applicable only for parties who make some contribution to the acquisition or development of the property. In such case, they are contributing to the reservoir of capital investment. If the property is fully developed, the reservoir of capital is complete, and the so-called contributions do not add to it but substitute for a portion of the reservoir. Hence, the cash, property, or services contributed must relate to the development of the property, and may include all or any part of the development of a mine; equipment for a well; the property on which the mine is to be developed or the well is to be drilled; any materials directly related to development; and also any services of the geologists, the driller, the

leasemen who assemble the block, the agent who acquires the property, the attorney who clears title, and the accountant who sets up the records. Services rendered or supplies furnished after the property has been fully developed would not qualify as a sharing arrangement. [Footnotes omitted]

Burke & Bowhay, *Income Taxation of Natural Resources,* § 207, p. 706 (1982).

The Internal Revenue Service issued regulations interpreting the exception to mortgage loan treatment afforded by Congress in § 636(a). The pertinent part of these regulations state:

Section 1.636–1(b)(1) ... For purposes of section 636(a) and this paragraph, an expenditure is for exploration or development to the extent that it is necessary for ascertaining the existence, location, extent, or quality of any deposit of mineral or is incident to and necessary for the preparation of a deposit for the production of mineral. However, an expenditure which relates primarily to the production of mineral (as, for example, in the case of a pilot water flood program with respect to the secondary recovery of oil) is not for exploration or development as those terms are used in section 636(a) and this paragraph. Whether or not a production payment is carved out for exploration or development shall be determined in light of all relevant facts and circumstances, including any prior production of mineral from the mineral deposit burdened by the production payment.

The Court's interpretation of the law is embodied in the instructions which were to be given the jury. These instructions were prepared prior to the trial on the oil payment/equipment issue and were as follows:

### OIL PAYMENT ISSUE JURY INSTRUCTION #1

This portion of the lawsuit concerns the nature of the use of equipment supplied by Toolpushers Supply Company to True Oil Company in exchange for oil payments. An oil payment, in general, is a right to a specified share of the oil in place or the proceeds from the sale of such oil, in exchange for a contribution of cash or equipment for use in the exploration and/or development of a mineral deposit, such as a petroleum reservoir. The oil payments at issue here have been determined by the Court to be valid oil payments, meeting the requirements of the Federal Tax Laws.

Nevertheless, the tax treatment of these oil payments depends upon an additional finding, which you are to make, determining whether certain equipment supplied by Toolpushers Supply Company in exchange for the oil payments were utilized in the exploration and/or development stage of a petroleum reservoir, on the one hand, or related primarily to the production stage of the reservoir on the other. The pertinent Treasury Regulation provides that:

'... An expenditure is for exploration or development to the extent that it is necessary for ascertaining the existence, location, extent or quality of any deposit of mineral, or is incident to and necessary for the preparation of a deposit for the production of mineral. However, an expenditure which relates primarily to the production of mineral (as, for example, in the case of a pilot waterflood program with respect to the secondary recovery of oil) is not for exploration or development.'

### OIL PAYMENTS ISSUE JURY INSTRUCTION #2

Plaintiffs contend that the exploration stage includes all expenditures and equipment utilized in locating, drilling and testing wildcat exploratory wells. Plaintiffs further contend that the development stage includes expenditures and equipment utilized in the drilling and testing of all step-out or development wells after the discovery well, which are drilled to ascertain the extent or quality of the petroleum reservoir or are incident to and necessary for the preparation of the reservoir for production including all

other expenditures and equipment utilized in the development of that field up to the commencement of any waterflood program conducted in that reservoir with respect to the secondary recovery of oil.

The Government, on the other hand, contends that the fact that an item of equipment may also be used initially in connection with the exploration and development of an oil and gas deposit is not determinative of its character if the item of equipment can be said to be primarily related to the production of the oil and gas deposit.

## OIL PAYMENTS ISSUE JURY INSTRUCTION # 3

The law provides that if the equipment exchanged for the oil production payment is utilized in the exploration or development stage of a petroleum reservoir or is incident to and necessary for the preparation of a deposit for production, the equipment for which the oil payment is given is paid for directly from the proceeds of the production from the well or wells upon which the equipment is utilized. Those proceeds are considered income only to the supplier of the equipment, Toolpushers Supply, who treats it as income received in exchange for the equipment. It is not income to the operator, True Oil Company. If, on the other hand, the equipment is used in the production stage such as a waterflood program with respect to the secondary recovery of oil from that reservoir, the amount of the oil payment is considered to be a loan to the operator True Oil Company and the proceeds from the sale of the production are considered income to True Oil Company.

## OIL PAYMENTS ISSUE JURY INSTRUCTION # 4

You are instructed that the equipment is not necessarily primarily devoted to production just because it is used in the production stage of a reservoir. If equipment is obtained and first used in the exploration or development stage or

is incident to or necessary to prepare for production of a petroleum reservoir, such equipment is not primarily related to production, even though it may subsequently be used in connection with production of the reservoir.

Whether or not an oil payment is utilized in the exploration and/or development stage or the production stage of a reservoir shall be determined by you in light of all relevant facts and circumstances including any prior production of oil and gas from the petroleum reservoir burdened by the oil payment.

As the trial of the issue proceeded, it became apparent to the Court, from the testimony of the witnesses and the import of the exhibits, that the dispute between the parties was in reality a dispute over the interpretation of the regulations and not a dispute over facts.

The Court perceives that the government relies almost totally on the regulatory language which states: "[H]owever, an expenditure which relates primarily to the production of mineral ... is not for exploration or development ...." The government argues that this should be interpreted to exclude all expenditures for equipment from the exception in § 636(a) when such equipment is used in a capacity primarily related to production, even if it is initially or necessarily used in exploration or development of the mineral deposit.

This interpretation, however, ignores the immediately preceding regulatory language which defines the types of expenditures which are for exploration or development. For proper statutory (or regulatory) construction, effect must be given to all the language of the statute or regulation. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); *Nevada Power Co. v. Watt*, 711 F.2d 913, 920 (10th Cir.1983). Further, the parenthetical example of the pilot water flood program—a secondary recovery method—would seem to be a limiting factor on the types of expenditures which relate primarily to production. This is particular-

ly true if the rule of *ejusdem generis* is applied to the parenthetical language.

An interpretation of the regulation which totally disqualifies an expenditure for equipment which is initially used in exploration and development but also used in production, would seem unprecedented and possibly outside the scope of § 636. *See* MAXFIELD & HOUGHTON, TAXATION OF MINING OPERATIONS, § 9.05[3][c]. *See also Amherst Coal Co. v. United States*, 295 F.Supp. 421 (S.D.W.Va.1969), which involved analogous concepts where haulage road built for development but also used in production of a mine was considered a development cost for purposes of 26 U.S.C. § 616.

The Court is, therefore, of the opinion that where equipment is obtained and initially used in exploration or development and is incident to the preparation of a deposit for production of a mineral and is later used in production, then such expenditures for equipment are not necessarily primarily related to production. Additionally, it is important to realize that the regulation speaks in terms such as *"any deposit of mineral"* or "incident to and necessary for the preparation of a *deposit* for the production of *mineral."* The emphasis on *deposit of mineral* would seem to indicate that one must look to production of the entire mineral deposit or "petroleum reservoir" (as used in the Court's instructions), rather than relying on a well-by-well breakdown as the government contends. This construction is consistent with generally explaining the regulatory language: "expenditure which relates primarily to the production of mineral" by reference to a pilot waterflood program which usually is undertaken after the extent of the entire reservoir is determined and prepared for production.

This Court, therefore, concludes that because plaintiffs' evidence is in accord with the Court's interpretation of the regulations, plaintiffs are entitled to a directed verdict in their favor on the oil payment/equipment issue.

This Court is also of the opinion that plaintiffs are entitled to a directed verdict on the grounds originally urged in their motion for summary judgment on this issue.

NOW, THEREFORE, IT IS ORDERED that a directed verdict in favor of plaintiffs be, and the same is, hereby granted.