GEORGIA POWER COMPANY,
Plaintiff-Appellant,

v.

Charles F. BAKER, Defendant-Appellee.

No. 86–8709.

United States Court of Appeals,
Eleventh Circuit.

Oct. 19, 1987.

H. Jerome Strickland, Robert C. Norman, Jr., Bob Berlin, Macon, Ga., for plaintiff-appellant.

S. Lee Storesund, Atlanta, Ga., for defendant-appellee.

Before FAY and KRAVITCH, Circuit Judges, and ALLGOOD *, Senior District Judge.

KRAVITCH, Circuit Judge:

Georgia Power Company, in May of 1984, sought to enjoin appellee Charles Baker from operating his seaplane on Lake Sinclair, a hydroelectric project owned and managed by Georgia Power in accordance with a license issued by the Federal Energy Regulatory Commission ("FERC"), formerly the Federal Power Commission. Three years earlier, Georgia Power had formalized a policy prohibiting the use of amphibious aircraft on company reservoirs, including Lake Sinclair. The district court denied both preliminary and permanent injunctive relief. Because the district court applied an erroneous interpretation of the applicable law, we reverse.

## I. BACKGROUND

Georgia Power's Lake Sinclair project began in 1929. The lake was formed by the construction of a dam across the Oconee River above Milledgeville, Georgia. Although the Oconee was unnavigable above Milledgeville, Georgia Power ("the company") was required to obtain a license for the project from FERC because the construction of the dam would affect the navigable portion of the river below Milledgeville.[1] Georgia Power acquired this license in 1947 and the project was completed in 1953.

Article 13 of Georgia Power's license, as amended, provides that:

So far as is consistent with proper operation of the project, the Licensee shall allow the public free access, to a reasonable extent, to project waters and adjacent project lands owned by the Licensee for the purpose of full public utilization of such lands and water for navigation and for outdoor recreational purposes, including fishing and hunting; *Provided,*

that the Licensee may reserve from public access, such portions of the project waters, adjacent lands, and project facilities as may be necessary for the protection of life, health, and property.

In 1981, Georgia Power promulgated a four-page statement barring the use of amphibious aircraft on its reservoirs, including Lake Sinclair. In devising this policy, the company obtained information from the Corps of Engineers, the Federal Aviation Administration ("FAA"), and representatives of parties interested in using Georgia Power's reservoirs for their seaplanes. Additionally, representatives of FERC participated in the formation of the policy, and the policy was provided to FERC upon its completion. Georgia Power's primary concern in prohibiting seaplanes was the safety of the boating public.

In August, 1964, appellee Charles Baker purchased a lot fronting on Lake Sinclair. Although appellee knew of Georgia Power's prohibition of seaplanes on its reservoirs, he began operating a seaplane in March 1984, both in the cove in front of his property and in the area of the lake in front of the dam. The property surrounding the cove area of the lake is densely populated, and both the cove and the dam areas receive heavy powerboat and sailboat traffic. Baker's primary use of his seaplane was for training other pilots to operate a seaplane, for which he generally received compensation. His records reveal that he used his seaplane 154 times between March, 1984 and early May, 1985, including 127 training flights involving 28 different individuals.

Georgia Power filed suit in federal district court in May 1984, seeking to enjoin Baker from using his seaplane on Lake Sinclair. The district court denied both preliminary and permanent injunctive relief. The court determined that FERC could not give Georgia Power the authority

---

* Honorable Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. *See Georgia Power Co. v. Federal Power Comm'n,* 152 F.2d 908 (5th Cir.1946) (requiring Georgia Power to obtain a federal license for its Lake Sinclair project under § 23(b) of the Federal Power Act, 16 U.S.C.A. § 817(1) (1987 supp.)).

to prohibit seaplane operation on Lake Sinclair, and that even if FERC could have, no such authority had issued. In denying preliminary relief, the court interpreted Article 13 of Georgia Power's license, *supra,* which allows it to reserve portions of the facility from public use. The court construed this provision as permitting the company to reserve *part* of the lake from *all* public access, but not to reserve *all* of the lake from any one part of the public, here seaplane operators. Additionally, the court found no evidence that the operation of seaplanes on the lake interferes with the operation of the power project. Finally, the court determined that the Article 13 clause which requires Georgia Power to allow free public access to the lake "to a reasonable extent" does not authorize Georgia Power to prohibit seaplane operations altogether. Subsequently, in denying permanent relief, the district court held that Georgia Power does not have property rights under state law which entitle it to ban seaplane operation.

## II. DISCUSSION

■ In reviewing district court decisions to grant or deny injunctive relief, we may not set aside findings of fact except where clearly erroneous. Fed.R.Civ.P. 52(a). But where questions of law are presented, we have plenary review over the district court's legal determinations. *Cathbake Inv. Co. v. Fisk Electric Co.,* 700 F.2d 654, 656 (11th Cir.1983).

The district court framed the issue in this case as whether FERC had the authority to confer upon Georgia Power the power to prohibit seaplane operations on its lakes. The court concluded that FERC could not give Georgia Power that authority and that, under Georgia law, Georgia Power had no property rights which would allow it to regulate seaplane usage on its property. We find, to the contrary, that the issue is not whether FERC could confer upon Geor-

gia Power the authority to ban seaplane operations on its reservoirs, but whether Georgia Power is precluded from exercising its water surface rights under state law by virtue of its obligation to operate its power project in compliance with federal regulatory and licensing requirements.

Part I of the Federal Power Act ("Act"),[2] originally the Federal Water Power Act,[3] was enacted to provide a means of comprehensive federal control over uses of the nation's water resources which the federal government has a legitimate interest in overseeing. These interests include navigation, flood control, irrigation, and, significantly, hydroelectric power. *Federal Power Comm'n v. Union Electric Co.,* 381 U.S. 90, 98, 85 S.Ct. 1253, 1258, 14 L.Ed.2d 239 (1965). Part I of the Act "was the outgrowth of a widely supported effort of the conservationists to secure enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, in so far as it was within the reach of the federal power to do so...." *First Iowa Hydro-Electric Coop v. Federal Power Comm'n,* 328 U.S. 152, 180, 66 S.Ct. 906, 919, 90 L.Ed. 1143 (1946). The principal concern of the Federal Water Power Act was the development and regulation "of hydroelectric power to meet the needs of an expanding economy." *Union Electric,* 381 U.S. at 99, 85 S.Ct. at 1258–59 (footnote omitted).

■ Although Part I of the Act provides a plan for comprehensive federal regulation of water resources, it does not entirely preempt state law concerning water resources. Section 27 makes this clear with respect to irrigation and municipal uses:

Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distri-

---

**2.** 41 Stat. 1063, as amended, 16 U.S.C. §§ 791a–823b.

**3.** 41 Stat. 1063 (1920). The original Federal Water Power Act was amended by Title II of the Public Utility Act of 1935, 49 Stat. 838, 16 U.S.C. §§ 791–823 (1958 ed.), and made Part I of the

Federal Power Act. The substance of the original Federal Water Power Act was left largely intact. Parts II and III of the Federal Power Act authorize the regulation of interstate transmission and sale of electricity.

bution of water used in irrigation or for municipal or other uses, or any vested right acquired therein.

16 U.S.C. § 821; *see First Iowa*, 328 U.S. at 175–76, 66 S.Ct. at 917. Although Part I of the Act contains no other explicit "saving" clauses, the Supreme Court has interpreted section 9(b) of the Act[4] as "[leaving] to the states their traditional jurisdiction subject to the admittedly superior right of the Federal Government, through Congress, to regulate interstate and foreign commerce...." *Id.*, 328 U.S. at 171, 66 S.Ct. at 915. The Court explained the continued vitality of state laws:

> The references made in § 9(b) to beds and banks of streams [and] to proprietary rights to divert or use water ... neither add anything to nor detract anything from the force of the local laws, if any, on those subjects. In so far as those laws have not been superseded by the Federal Power Act, they remain as applicable and effective as they were before its passage.

*Id.*, 328 U.S. at 178, 66 S.Ct. at 918.

The Supreme Court subsequently reiterated the fact that as long as the federal government has not exercised its power to abolish state law riparian rights, those rights survived the passage of the Act, even if they are within the scope of the government's dominant servitude. In *Federal Power Comm'n v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 74 S.Ct. 487, 98 L.Ed. 666 (1954), the Court held that the Federal Water Power Act had not extinguished existing state law private proprietary rights to use waters of a navigable stream for power purposes. The Court explained:

> The references in the Act to preexisting water rights carry a natural implication that those rights are to survive, at least until taken over by purchase or otherwise. Riparian water rights, like

other real property rights, are determined by state law. Title to them is acquired in conformity with that law. The Federal Water Power Act merely imposes upon their owners the additional obligation of using them in compliance with that Act.

347 U.S. at 252, 74 S.Ct. at 495 (footnote omitted).

■ Nothing in the record indicates that the federal government has appropriated appellant's state law water surface rights. Given our conclusion that the Act does not deprive Georgia Power of these rights except to the extent that it requires them to be exercised in conformity with the Act, we proceed to determine the extent of appellant's rights under Georgia law.

Georgia follows the common law rule regarding water surface rights "that the owner of a bed of a nonnavigable lake has the exclusive right to the use of the surface of the waters above and may exclude other bed owners and fence off his portion." *Lanier v. Ocean Pond Fishing Club*, 253 Ga. 549, 322 S.E.2d 494, 496 (1984). In *Lanier*, the court upheld an injunction granted to a fishing club that owned most of the bed of Ocean Pond and the surrounding property to prevent the owner of a lot adjacent to the pond from boating, fishing, or otherwise going upon the land and waters of the club. The court explained that "[t]he owner of a nonnavigable lake ... has exclusive boating rights and one who puts his boat in the lake of another without permission is a trespasser," 322 S.E.2d at 496, citing *Bosworth v. Nelson*, 172 Ga. 612, 158 S.E. 306 (1931). The court distinguished the case before it, which it described as a case of trespass, from cases involving the right to the use of the water itself. It concluded that the adjacent lot owner was free to use the portion of the lake surface that he owned, i.e., that

---

**4.** 16 U.S.C. § 802(b), which provides:

> Each applicant for a license under this chapter shall submit to the commission—
>> (b) Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect

to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purposes of a license under this chapter.

which covered property to which he had title.

■ Georgia Power possesses fee simple title to the bed of Lake Sinclair. Baker owns a lot contiguous to the lake. Accordingly, we conclude that appellant has the right, under Georgia law, to exclusive use of the surface of the lake above land to which it has title.[5]

The fact that *Lanier* involved a natural lake rather than a man-made lake, as in this case, does not require a different result. The court in *Lanier* relied upon a case holding that the owner of a portion of the bed of an artificial pond had no fishing rights in the portion of the pond covering land owned by another party. *See State Highway Dep't v. Noble*, 114 Ga.App. 3, 150 S.E.2d 174, 178 (1966). The conjunction of *Lanier* and *Noble* indicates that, in matters involving water surface rights, it is irrelevant whether the lake in question is natural or man-made. *Cf. Boardman v. Scott*, 102 Ga. 404, 30 S.E. 982, 988 (1897) (treating man-made pond as a natural pond where pond had been in existence for over 40 years and clearly was intended to have a stable and permanent existence).

■ Accordingly, to the extent its rights are not inconsistent with federal law, Georgia Power has the authority to exclude adjacent landowners from the surface of the lake over its property. Article 13 of appellant's federal license, however, requires that it:

> allow the public free access, to a reasonable extent, to project waters and adjacent project lands owned by the Licensee for the purpose of full public utilization of such lands and water for navigation and for outdoor recreational purposes ...; *Provided*, that the Licensee may reserve from public access, such portions of the project waters, adjacent lands, and project facilities as may be necessary for

the protection of life, health, and property.

Thus, the question remains whether Georgia Power's prohibition of seaplane operations on Lake Sinclair is consistent with the requirements of its federal license that it allow reasonable public access, reserving such "facilities" as necessary for the protection of life, health, and property.

Appellant formally adopted the policy banning seaplanes from its reservoirs in 1981, although that had been its informal policy prior to that time. After a thorough study of the matter, the company concluded that any possible benefits to be gained by allowing seaplane operations were "outweighed by the potential detriment to the public welfare...." The company's policy notes the "intense and extensive" boating activity—including the use of canoes, sailboats, rafts, rowboats, and powerboats—on its reservoirs. In contrast, the company concluded that a very small percentage of the public has the resources to undertake the use of seaplanes, and that there were presently available facilities elsewhere in Georgia which were more than sufficient to accommodate seaplane usage demand. More importantly, the company decided that seaplane operation on its reservoirs would present significant hazards both to the boating public and to seaplane pilots. Take-off and landing constitute a danger in themselves; and the exposed propeller of seaplanes poses an additional hazard to people on the lake as well as around docking facilities and boat ramps. Moreover, the pilots would have to circumvent powerlines, underwater hazards, and navigational buoys. The fact that hydroelectric reservoirs, such as Lake Sinclair, are subject to potentially "extraordinary" changes in water levels would also complicate seaplane operations. Thus, the company determined:

> Dedication of a significant area of a reservoir to seaplane landing and take-

5. The district court made no finding regarding the restrictive covenant in appellee's deed (included in the record) providing that appellee's "rights in the use of Sinclair reservoir for any purpose shall not be superior to the privileges of use thereof by the general public, as such privileges may, from time to time, be limited and regulated by (Georgia Power Company)." As the validity or nonvalidity of the covenant has no effect upon our conclusion, we need not address it.

off operations in order to assure overall public safety would be inconsistent with Georgia Power's policy of fostering both diversity and extensive public recreational use of its reservoirs. In light of the apparent minimal need for recreational seaplane use, Georgia Power would be increasing the diversity of recreational uses very slightly and the number of recreational users insignificantly by setting aside landing and take-off areas, while substantially decreasing the area available for public use generally.

Accordingly, appellant concluded that a total prohibition of seaplanes on its reservoirs would be appropriate and consistent with its FERC license requirements.

The dangers associated with seaplane use are fully illustrated by appellee's own seaplane operation. As mentioned previously, appellee's primary usage of his plane has been to train other pilots to operate a seaplane. In order to allow his students to practice dealing with the dangers of such flying, the training exercises entail "porpoising," "skipping," and other activities normally considered improper and hazardous. The areas where appellee operates his plane are frequently used by water-skiers, and one of his take-off areas crosses a section of the lake used by a yacht club for sailboat races. This take-off route also places him at right angles to the landing and take-off paths of aircraft using the Baldwin County airport located near the lake.

Baker himself has admitted that he has been required to take evasive action on several occasions to avoid conflicting boat traffic. He also has stated that he believes that Georgia Power should have rules regulating seaplane usage on its lakes. He argues, however, that while Georgia Power may reasonably regulate seaplane operation, it does not have the authority to ban seaplanes entirely from the lake. He contends that the company's license allows it only to restrict the public from property which is necessary for the proper running of the project and which poses a material threat to an uninformed public, and that the company's complete ban on seaplane operations exceeds its lawful authority in these regards.

■ We disagree with appellee's interpretation of the company's license. The license states that Georgia Power *"shall allow the public free access, to a reasonable extent...."* (emphasis supplied). We find that the company's prohibition on seaplane operation is entirely reasonable given its safety concerns and its attempts to maximize the recreational potential of its lakes. The license also provides "that the Licensee *may reserve from public access such portions of the public waters ... as may be necessary for the protection of life, health, and property."* (emphasis supplied). To read this language as allowing the company only to ban seaplanes on part, but not all, of the surface of any of its lakes is unduly constrictive. Recreational uses can conflict and compete, and given the enormous number of people who use Lake Sinclair to fish, sail, swim, and water-ski, while appellee is the only seaplane operator on the lake, Georgia Power has made a justifiable decision to maximize public use and satisfy the greatest diversity of public interest by banning seaplane operations on the lake.

Georgia Power's prohibition of seaplanes on its reservoirs is a thoughtfully conceived policy and is a reasonable limitation on public access to its lake properties. As such, the ban is a proper application of Georgia Power's state law rights exercised in conformity with its federal license.

## III. CONCLUSION

The decision of the district court denying Georgia Power Company a preliminary and permanent injunction prohibiting Charles F. Baker from operating his seaplane on the waters of Georgia Power's Sinclair Dam Project is REVERSED and the case is REMANDED for further proceedings consistent with this opinion. Because we have decided that appellant's prohibition of seaplanes is consistent with its rights under its federal license and state law, we need not

address the other arguments raised by the parties.