Kenneth P. KIRCHMAN and Budagail S. Kirchman, Leo P. Ayotte and Nancy C. Ayotte, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 87–3585.

United States Court of Appeals, Eleventh Circuit.

Jan. 11, 1989.

Martin M. Ruken, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for petitioners-appellants.

Richard Farber, Tax Div., Dept. of Justice, Kenneth L. Greene, Washington, D.C., for respondent-appellee.

Before JOHNSON and CLARK, Circuit Judges, and ZLOCH *, District Judge.

JOHNSON, Circuit Judge:

This case arises on appeal from a United States Tax Court decision affirming the Commissioner of the I.R.S. in assessing a deficiency against appellant taxpayers. The Commissioner assessed a deficiency against approximately 1400 taxpayers for loss deductions taken for years 1975 through 1980 incurred in connection with

---

* Honorable William J. Zloch, U.S. District Judge for the Southern District of Florida, sitting by designation.

commodity transactions entered into on the London Metals Exchange. Taxpayers' challenges were consolidated in a single case before the tax court. The tax court held that these transactions were shams with no legitimate economic substance because taxpayers had no profit motive, and upheld the Commissioner. *Glass v. Commissioner*, 87 T.C. 1087 (1986).[1] Petitioners, four individual taxpayers, appealed. We affirm.

## I. FACTS

The taxpayers involved in this dispute engaged in commodity option and futures transactions on the London Metals Exchange in the years 1975 to 1980. Taxpayers deducted as ordinary losses under I.R.C. § 165(c)(2), 26 U.S.C.A. § 165(c)(2),[2] losses incurred in the first year of a two-year series of transactions involving commodities. Each taxpayer incurred significant first-year losses, and many realized approximately offsetting second-year capital gains.

The majority of these commodity transactions took the form of an option straddle transaction. An "option straddle transaction" is a commodity trading strategy involving both option and futures contracts. An option contract gives the holder of the option the right to purchase a particular commodity for a particular price on or before a certain date in the future. A futures contract is a contract that "requires the buyer to receive and the seller to deliver a specified quantity of a given commodity at some future date." *Glass*, 87 T.C. at 1101. A straddle is the simultaneous holding of contracts to buy and to sell the same commodity. Each contract is called a "leg" of the straddle.

The option straddle transactions occurred over two years. In the first year, a dealer in London executed a series of transactions on behalf of the taxpayer. The first step would be simultaneously to purchase an option to purchase a particular commodity (a "call option") and to sell a call option for the same quantity of the same commodity with different delivery dates.[3] In the second step, the dealer simultaneously purchased and sold futures contracts for identical quantities of the same commodity but with different delivery dates. This is called a futures straddle. At this point, in the simplest transaction, the taxpayer would have purchased a call option and a futures contract, and would have sold a call option and a futures contract on one particular commodity (typically silver). Each leg of the option and futures straddles would have a unique delivery date.

The dealer would then "close out" the legs of the option straddle by purchasing and selling identical offsetting positions. For the call option purchased, the dealer would sell an identical put option, and vice versa for the put option. Because this second set of option contracts would be purchased and sold on a different date than the original option contracts, the prices of the second contracts would differ. The result would be that in closing out one leg of the option straddle, the taxpayer would incur a loss, and in closing out the other leg, the taxpayer would incur an approximately equal gain. The loss realized would be deductible as ordinary loss under I.R.C. § 165(c)(2), and could be used to offset income from other, unrelated sources. The gain would be a short-term capital gain.

To defer recognition of this gain, the taxpayer would close out the loss leg of the futures straddle[4] by purchasing an identi-

---

1. *Aff'd on other grounds sub nom. Herrington v. Commissioner*, 854 F.2d 755 (5th Cir.1988) (affirming on estoppel grounds taxation of gains to several individual taxpayers after losses were deducted).

2. Section 165(c)(2) reads, "In the case of an individual, the deduction under subsection (a) shall be limited to ... losses incurred in any transaction entered into for profit though not connected with a trade or business...."

3. The transaction was also completed using "put" options, options to sell a particular commodity at a particular price on or before a certain date in the future, or both put and call options.

4. "Because an inverse relationship normally exists between the legs of a futures straddle, one leg will have an unrealized loss while the other leg will have an unrealized gain." *Glass*, 87 T.C. at 1105.

cal offsetting position and replacing it with a new position with a different delivery date. This is known as a "switch transaction." The loss incurred by closing out this leg of the futures straddle would be short-term capital loss and typically would approximately equal the short term capital gain realized by closing out the option straddle. This capital loss, then, would offset that capital gain.

The final step of the option straddle transaction would occur in the next year, although always at least six months after closing out the loss leg of the futures straddle. Both legs of the futures straddle would be closed out by offsetting trades, resulting in a gain approximately equal to the loss realized by closing out the loss leg of the futures straddle in the first year. The gain realized would be either long or short-term capital gain. In a second series of similar transactions, recognition of that gain could be deferred for another year.

A minority of the taxpayers involved in these transactions achieved similar tax results using an "option-hedge" trading strategy. The option-hedge transactions were similar to the option straddle transactions. The tax court provided a good summary of the transactions:

> In an option-hedge transaction, the sale of a call and/or put option was hedged by the purchase of a futures contract (to hedge the call) and/or the sale of a futures contract (to hedge the put). Shortly thereafter, the option positions would be closed out at a net loss through the purchase of an identical offsetting call and/or put option. Simultaneously with the purchase of the closing option positions, futures contracts would be executed to hedge the previously purchased and/or sold futures, thus forming one or more futures straddles. Finally, in the following year, the futures straddles would be closed out at a gain approxi-

mately equal in amount to the loss incurred on the sold options.

*Glass,* 87 T.C. at 1106.

The tax results of these transactions would be that in the first year, the taxpayer would have realized an ordinary loss, a short-term capital gain, and an approximately offsetting capital loss. In the second year, the taxpayer would have realized a capital gain approximately equal to the capital loss (and, by extension, the ordinary loss) realized and reported in the first year. The petitioners in this case followed this pattern.

Almost all of these option-straddle or option-hedge transactions were conducted through one of six major commodity dealers: Competex, Rudolf Wolff, Gardner Lohmann, Amalgamated, Commodity Analysis, and Rothmetal. Eleven other broker/dealers were involved. The tax court analyzed the transactions done by these six dealers as representative of all transactions, with the understanding that taxpayers dealing through one of the smaller dealers would subsequently have the opportunity to demonstrate how their transactions differed from these. The petitioners in this case each dealt with one of the major brokers.[5]

In a normal commodity straddle trading strategy, profit results from changes in the price differential ("spread") between the legs of the straddle.[6] In the transactions at issue in this case, all dealers minimized the risks of changes in the spread to minimize the risks of actual loss, and thereby greatly reduced or eliminated any chance of profit. Additionally, promotional materials for five of the six major dealers focused on the tax advantages of these commodity straddle trading strategies and either failed to mention or downplayed the profit potential. Finally, each of the brokerage companies engaged in abnormal trading practices in connection with these transactions, such

---

5. For a detailed discussion of the transactions of each commodity broker, see *Glass,* 87 T.C. at 1107–1153.

6. For example, "[a] straddle in which the long position [ (after purchase of futures contract) ] is held in a month farther out than the short position [ (sale of futures contract) ] will increase in value if the price differential between the legs widens and will decrease in value if the price differential narrows." *Glass,* 87 T.C. at 1102. The converse is also true.

as not laying off trades, not requiring adequate margins, executing trades before receiving initial margins, using prices that diverged substantially from market prices, manipulating commissions, and artificially adjusting contangos to achieve desired results.[7]

The taxpayers deducted the first-year losses under I.R.C. § 165(c)(2), claiming these were losses incurred in transactions entered into for profit. The Commissioner disallowed the deductions, and the tax court affirmed. The tax court found that these transactions were substantive shams because the petitioners did not enter into them with a profit motive. *Id.* at 1162. The court found that this "was a prearranged sequence of trading calculated to achieve a tax-avoidance objective—not investments held for non-tax profit objectives." *Id.* at 1163. The court concluded that because these transactions were shams, the losses incurred were not deductible under I.R.C. § 165(c)(2).

## II.  DISCUSSION

### A.  *Standard of Review*

■ Petitioners have the burden of showing that the transactions were not a sham. *Brown v. Commissioner,* 85 T.C. 968, 998 (1985) (taxpayers challenging assessment of deficiency have burden of proof). Decisions about whether transactions are shams are normally reviewable under a clearly erroneous standard. *See, e.g., Enrici v. Commissioner,* 813 F.2d 293, 295 (9th Cir.1987) ("The clearly erroneous standard of review would govern even if the finding that the transactions were shams was inferred from undisputed basic facts concerning the transactions because the inference is still essentially factual."). Nevertheless, we review the tax court's conclusions *de novo.*

In this case, the tax court assumed as true the facts alleged for purposes of its analysis. The court itself stated that it was focusing on an issue of law, i.e.,

whether taxpayers' allegations, if proven, would be sufficient to achieve the tax results desired. *Glass,* 87 T.C. at 1172. The court held that these were sham transactions as a matter of law. Stated as such, the standard of review is *de novo. See Miller v. Commissioner,* 836 F.2d 1274, 1277 (10th Cir.1988) (legal conclusions by tax court reviewed *de novo ); see generally Frank Lyon Co. v. United States,* 435 U.S. 561, 581 n. 16, 98 S.Ct. 1291, 1302 n. 16, 55 L.Ed.2d 550 (1978) ("The general characterization of a transaction for tax purposes is a question of law subject to review."); *Georgia Power Co. v. Baker,* 830 F.2d 163 (11th Cir.1987) (issue of law reviewed *de novo ).*

### B.  *Sham Transaction Doctrine*

■ The sham transaction doctrine requires courts and the Commissioner to look beyond the form of a transaction and to determine whether its substance is of such a nature that expenses or losses incurred in connection with it are deductible under an applicable section of the Internal Revenue Code. If a transaction's form complies with the Code's requirements for deductibility, but the transaction lacks the factual or economic substance that form represents, then expenses or losses incurred in connection with the transaction are not deductible.

The sham transaction doctrine emerged from the Supreme Court's decision in *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). In *Gregory,* the Court affirmed the Commissioner in denying deductions claimed by taxpayers for losses and expenses incurred in a corporate reorganization. The taxpayers had followed each step required by the Code for the reorganization. Nevertheless, the Court held these losses nondeductible. The Court held that this transaction was a "mere device" for the "consummation of a preconceived plan" and not a reorganization within the intent of the Code as it then existed. *Id.* at 469, 55 S.Ct. at 267–268.

---

**7.** The tax court opinion explains the transactions thoroughly, so we need not repeat the details here. *See Glass,* 87 T.C. at 1160–63. Although these trading practices strongly support the tax court's conclusion that these transactions were shams, they are not central to our decision.

Because the transaction lacked economic substance, as opposed to formal reality, it was not "the thing which the statute intended." *Id.*

The sham transaction doctrine has become widely accepted, *see generally B. Bittker, Federal Taxation of Income, Estates and Gifts* p 4.3.3 (1981 and Supp. 1988), as has the general notion that courts should look at the substance of a transaction rather than just its form. *See generally Frank Lyon Co. v. United States,* 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978) (Court looked at economic substance or reality of sale and leaseback transactions); *Knetsch v. United States,* 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960) (interest expense deductions disallowed because only thing of substance to be realized in transaction was tax deduction); *Commissioner v. Court Holding Co.,* 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945) (creating step transaction doctrine, whereby courts must consider all steps of transaction in light of entire transaction, so that substance of transaction will control over form of each step). While it is true that a taxpayer can structure a transaction to minimize tax liability under the Internal Revenue Code, *Gregory,* 293 U.S. at 469, 55 S.Ct. at 267–268, that transaction must nevertheless have economic substance in order to be "the thing which the statute intended." *Id.*

Taxpayers deducted the losses in this case under I.R.C. § 165. I.R.C. § 165(a) allows losses in general to be deducted from a taxpayer's taxable income.[8] I.R.C. § 165(c)(2) limits those deductible losses to "losses incurred in transactions, not in connection with a trade or business, entered into for profit." This statute was clearly aimed at economically-motivated, or profit-motivated, transactions. *Miller v. Commissioner,* 836 F.2d 1274, 1278–79 (10th Cir.1988). If a transaction is not motivated by profit or economic advantage, then that transaction is a sham for purposes of analysis under I.R.C. § 165(c)(2). *See Boynton v. Commissioner,* 649 F.2d 1168, 1172 (5th Cir. Unit B 1981), *cert. denied,* 454 U.S. 1146, 102 S.Ct. 1009, 71 L.Ed.2d 299 (1982);[9] *cf. Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). Naturally, the profit or economic motivation cannot be merely tax benefits.

Although Section 108 of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 630 (1984) ("Section 108"),[10] provides for deduction of losses incurred in closing one leg of a straddle transaction, in order for Section 108 to apply, the underlying transaction must not be a sham. *Miller,* 836 F.2d at 1278–79; *see also Neely v. United States,* 775 F.2d 1092, 1094 (9th Cir.1985). The Eleventh Circuit recently affirmed a tax court decision holding that Section 108 does not apply where the transactions involved are shams. *Forseth v. Commissioner,* 85 T.C. 127 (1985) (holding commodity straddle transactions shams because of lack of economic substance), *aff'd without published opinion sub nom. Wooldridge v. Commissioner,* 800 F.2d 266 (11th Cir.1986). The analysis of whether something is a sham, then, must occur before analysis of the for-profit test of I.R.C. § 165(c)(2) and Section 108. *See Sochin v. Commissioner,* 843 F.2d 351, 353–54 n. 6 (9th Cir.1988) (Section 108 does not apply until the court determines that the transaction is not a sham); *accord Enrici,* 813 F.2d at 295 n. 1; *Mahoney v. Commissioner,* 808 F.2d 1219, 1220 (6th Cir.1987).

---

8. I.R.C. § 165(a) states, "There shall be allowed as a deduction any loss sustained during the taxable year...."

9. In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), this Circuit adopted as precedent all decisions of Unit B of the former Fifth Circuit.

10. Section 108(a) stated in its original form: "in the case of any disposition of 1 or more positions ... [that] form part of a straddle ... any loss from such disposition shall be allowed for the taxable year of the disposition if such position is part of a transaction entered into for profit." Pub.L. No. 98–369, 98 Stat. 494, 630 (1984). In 1986 Congress amended this part of Section 108 to read: "shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business." Pub.L. No. 99–514, 100 Stat. 2818 (1986).

Courts have recognized two basic types of sham transactions. Shams in fact are transactions that never occur. In such shams, taxpayers claim deductions for transactions that have been created on paper but which never took place. Shams in substance are transactions that actually occurred but which lack the substance their form represents. *Gregory,* for example, involved a substantive sham. The issue in this case is whether, assuming the transactions actually occurred as claimed, the transactions are shams in substance.

■ Petitioners at oral argument strongly asserted that the tax court erred in failing to evaluate the subjective intent of each individual taxpayer. Petitioners argued that the tax court could not find that these transactions constituted a substantive sham without evaluating the intent or motive of each person entering into the transactions. We disagree.

■ It is true that I.R.C. § 165(c)(2) and Section 108 require a transaction to be entered into for profit, and that the analysis of the for-profit test under these provisions focuses on the subjective intent of the taxpayer. *See e.g., Helvering v. National Grocery Co.,* 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346 (1938); *Miller v. Commissioner,* 836 F.2d 1274, 1280 (10th Cir.1988) ("the meaning of 'transaction entered into for profit' has been settled at least since 1938, when the Supreme Court indicated that a subjective standard is applied and the taxpayer's primary motive must be one of profit"). Under I.R.C. § 165(c)(2), courts evaluate whether a taxpayer entered the transactions "primarily for profit," *Miller,* 836 F.2d 1280, and the test under Section 108 is the same. *Id.; see also Landreth v. Commissioner,* 859 F.2d 643 (9th Cir.1988). Naturally, the evaluation of the level of profit motive possessed by a taxpayer in entering into a transaction involves an inquiry into the subjective motive or intent of the taxpayer. The analysis of whether a transaction is a substantive sham, however, addresses whether a transaction's substance is that which its form represents. That does not necessarily require an analysis of a taxpayer's subjective intent. Once

a court determines a transaction is a sham, no further inquiry into intent is necessary.

The focus of the inquiry under the sham transaction doctrine is whether a transaction has economic effects other than the creation of tax benefits. *Knetsch v. United States,* 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960). Several courts have focused on two related factors, business purpose and economic substance, to determine whether a transaction is a sham. *See, e.g., Bail Bonds by Marvin Nelson, Inc. v. Commissioner,* 820 F.2d 1543, 1549 (9th Cir.1987); *Rice's Toyota World, Inc. v. Commissioner,* 752 F.2d 89, 91 (4th Cir. 1985). The determination of whether the taxpayer had a legitimate business purpose in entering into the transaction involves a subjective analysis of the taxpayer's intent. The inquiry into whether the transaction had economic substance beyond the creation of tax benefits, however, does not involve a subjective inquiry. *Bail Bonds by Marvin Nelson, Inc.,* 820 F.2d at 1549 ("The economic substance factor involves a broader examination of ... whether from an *objective* standpoint the transaction was likely to produce economic benefits aside from a tax deduction.") (emphasis added).

■ It is clear that transactions whose sole function is to produce tax deductions are substantive shams, regardless of the motive of the taxpayer. *See Mahoney,* 808 F.2d at 1220 (inquiry is whether transaction has any practical economic effects beyond the creation of tax benefits); *Boynton,* 649 F.2d at 1172 (transactions that have no economic effect other than creation of tax losses are shams); *Tolwinsky v. Commissioner,* 86 T.C. 1009, 1037 (1986) ("[w]here transactions serve no 'purpose, substance, or utility apart from their anticipated tax consequences' they are disregarded for tax purposes"); *Julien v. Commissioner,* 82 T.C. 492 (1984) (interest expenses incurred in silver straddles disallowed under I.R.C. § 162(a) because transactions served no economic purpose beyond generating interest deductions); *cf. Frank Lyon Co. v. United States,* 435 U.S. 561, 583–84, 98 S.Ct. 1291, 1303–04, 55 L.Ed.2d 550 (1978) (where "there is a ... transaction ... encouraged

by business or regulatory realities, ... imbued with tax-independent considerations, and ... not shaped solely by tax-avoidance features," the transaction is not a sham).

██ We find, based on the record before us, that the sole function of these transactions was to obtain deductions to income for federal income tax purposes. We agree with the tax court's conclusion that this was "a prearranged sequence of trading calculated to achieve a tax-avoidance objective—not investments held for non-tax profit objectives." *Glass*, 87 T.C. at 1163. Consequently, the losses and expenses incurred in connection with these straddle transactions are not deductible under I.R.C. § 165(c)(2).

Every taxpayer closed out the option contracts in the first year and incurred significant deductible losses regardless of the effect such an action would have on the overall profitability of the transaction.[11] No taxpayer received a return of the initial margin deposit, regardless of whether the taxpayer "earned" a gain or "incurred" a loss; nor did any taxpayer actually receive payment of gains earned. Many taxpayers asserted that these transactions resulted in an absolute loss; yet no taxpayer contributed funds beyond the initial margin. The advertising material sent by finders for the commodity brokerage houses promoted the tax benefits available to the exclusion of potential profit. These facts support the conclusion that these were transactions entered into for the achievement of pre-arranged tax results.[12]

There may have been an incidental and minimal risk of actual gains and losses. That risk and the fact that the account balances of some taxpayers fluctuated due to changes in the silver futures market do not alter our conclusion that the sole function of these transactions was to obtain tax deductions. We hold that where, as here, the only substance of a transaction is the creation of income tax benefits for a fee, however the taxpayer characterizes that fee, that transaction is a sham for income tax purposes.

In certain circumstances, we agree that an inquiry into the subjective intent of a taxpayer is appropriate. For purposes of this decision, however, we need not define with specificity the level of subjective profit motive or non-tax-avoidance purpose a taxpayer must possess in entering into a transaction for that transaction to pass scrutiny under the sham transaction doctrine. Because the sole function of these transactions was to create first year ordinary losses and capital gains treatment for subsequent offsetting gains, the transactions are shams. Whatever the taxpayers' motives in entering into these transactions, the transactions are not of the nature of the transactions at which I.R.C. § 165(c)(2) is directed. If a transaction is not what the statute intended, for whatever reason, then losses and expenses incurred in connection with the transaction are not deductible.

Petitioners argue that the tax court erred by focusing on the first year of the transaction. Petitioners argue that by doing so, the tax court failed to assess the business purpose or economic substance of the transaction as a whole. Alternatively, petitioners argue that closing out the first leg of an option straddle transaction can never be a sham, because Section 108 expressly provides for recognition of losses from these transactions.

██ Petitioners are correct in asserting that the tax court was obligated to analyze

---

**11.** In straddle transactions, the potential for profit comes from difference gains created by a change in the spread between the legs of the straddle. In this case, the tax court found the trading strategy eliminated the potential for profit in the first year and reduced the potential for profit in the second year. By closing out the option straddle, taxpayers in every case were assured of a loss in the first year. *Glass*, 87 T.C. at 1174. Additionally, the "intentional skewing of the transaction to realize year one losses introduce[d] an additional negative element which prohibitively stack[ed] the deck against the chances of significant financial success." *Id.*

**12.** The Commissioner also argued that the dealers involved engaged in artificial pricing, artificial fixing of commissions, artificial contangoes, and failed to require or maintain margins. *Glass*, 87 T.C. at 1159–61. The tax court did not make any factual findings with regard to these claims.

the entire transaction. *See Smith v. Commissioner,* 78 T.C. 350 (1982), *aff'd without opinion,* 820 F.2d 1220 (4th Cir.1987). The tax court did analyze the entire transaction, however, stating, "the focus of our attention is petitioners' entire tax straddle scheme, and not each separate straddle. It is the overall scheme which taints the deductibility of the year one losses." *Glass,* 87 T.C. at 1174. The court then analyzed the interrelationship between the first year transactions and the overall transaction. The court concluded that no taxpayer had a non-tax-avoidance purpose behind the transactions, because the taxpayers "could have profited from difference gains in commodity straddle transactions had they not *in every instance* entered into closing transactions or sold options in year one of the straddle operation." *Id.* In other words, the court evaluated the first year transactions in the context of the entire scheme and the trading strategy involved. The court found that the fact that the first year transactions lacked a true profit function when considered in the context of the entire scheme supports the conclusion that the scheme itself lacked a profit motive. We agree with the tax court's approach and conclusion.[13]

■ Petitioners' second argument, that because Section 108 expressly provides for recognition of losses incurred in the first year of straddle transactions, those transactions cannot be substantive shams, is similarly unpersuasive. Petitioners are correct in asserting that Section 108 allows them intentionally to incur a loss in the first year of a straddle transaction. That does not mean, however, that losses from transactions entered into in the first year of all straddle transactions are deductible. As petitioners correctly argued, the court

must consider the entire transaction, not just the first year trades. Although the taxpayers did not need a profit motive behind the first year transactions themselves, the commodity straddle transactions as a whole must not have been shams in substance. The sole function of these transactions was to produce tax benefits, however. Consequently, the transactions are shams in substance, and Section 108 does not apply.

■ Petitioners finally argue that these transactions were not shams in substance because petitioners accepted the risk of difference gains and losses. The record shows that due to fluctuations in the prices of silver futures, many of the taxpayers did not recover in year two the losses claimed in year one.[14] The fact that some taxpayers did not realize the anticipated gains in the second year does not mean the transactions were not shams. The losses in the first year were guaranteed, and the trading strategy insured that in every case the losses occurred. The objective profit potential of a transaction is certainly a factor to consider, but where as here the taxpayers' trading strategy ignored any potential profit in the maximization of deductible losses, the existence of that potential alone does not create the existence of a profit motive. Although there may have been incidental and minimal risks of profit or loss,[15] those risks are insufficient to change the nature of these transactions. The transactions had the sole function of producing taxable losses in one year and offsetting capital gains in the next. The fact that the gains were not exactly offsetting does not alter that fundamental nature.

The losses incurred by petitioners in connection with these straddle transactions are not deductible under I.R.C. § 165(c)(2) or

---

**13.** We note that our review of the tax court's decision is *de novo.* Even if the tax court had erred in its approach, this Court has considered the entire transaction and reaches the same result.

**14.** The record does not show how many taxpayers were able to recover their losses in the third year of the transaction. *Glass,* 87 T.C. at 1162.

**15.** It is unclear whether those risks actually existed. The parties stipulated that no taxpayer

actually received a gain, and it is unclear whether any taxpayer contributed additional funds beyond the initial margin to cover losses. No taxpayer received a return of the initial margin, however, regardless of whether the taxpayer "earned" a gain or "incurred" a loss. We will assume that petitioners did accept some risk of actual change in economic position in entering into these transactions.

Section 108, because the transactions lacked economic substance. We hold that taxpayers have not met their burden of showing that these transactions were not a sham. *See Brown v. Commissioner*, 85 T.C. 968, 998 (1985). Consequently, we affirm the tax court.

## C. *Section 108*

Petitioners argue that they entered into transactions with a "reasonable prospect of profit," and that therefore the losses are deductible under Section 108. *Wehrly v. United States*, 808 F.2d 1311 (9th Cir.1986). We note that the Ninth Circuit has reversed its reading in *Wehrly* of Section 108's for-profit test. *See Landreth v. Commissioner*, 859 F.2d 643 (9th Cir.1988) (test under Section 108 is whether a taxpayer's motive was primarily for profit). We are inclined to agree with the Ninth Circuit and with the Tenth Circuit's opinion in *Miller v. Commissioner*, 836 F.2d 1274 (10th Cir.1988), that Section 108 incorporated the "primarily for profit" test of I.R.C. § 165(c)(2). We need not address this issue, however, because the finding that these transactions lacked economic substance necessarily results in an affirmance of the Commissioner's denial of the claimed deductions.

## III. CONCLUSION

These transactions were shams in substance because the sole function of the transactions was to produce certain tax advantages. Consequently, the tax court's affirmance of the Commissioner's disallowance of these deductions under I.R.C. § 165(c)(2) is AFFIRMED.