**Ila I. GAIL, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 93–4234.

United States Court of Appeals, Tenth Circuit.

June 27, 1995.

J. Franklin Allred of Salt Lake City, UT, for plaintiff-appellant.

Patricia M. Bowman, Dept. of Justice, Tax Div., Washington, DC (Loretta C. Argrett, Asst. Atty. Gen., and David English Carmack, Dept. of Justice, Tax Div., Washington, DC, with her on the brief), for defendant-appellee.

Before KELLY, BARRETT, and HENRY, Circuit Judges.

HENRY, Circuit Judge.

Taxpayer Ila Gail appeals the district court's summary judgment order characterizing the proceeds of a judgment in a fraud and conversion action as income. We have jurisdiction pursuant to 28 U.S.C. § 1291. For the reasons set forth below, we reverse in part and remand to the district court.

## BACKGROUND

Mrs. Gail is an elderly woman who owned an undivided one-half interest in ninety-six acres of real property in Trumball County, Ohio. When Mrs. Gail moved to Utah, the owner of the other one-half interest forged her name on a power of attorney form and executed an oil and gas lease to a development company. The developer found that the land was rich in natural gas and extracted the gas. However, the owner of the other one-half interest did not tell Mrs. Gail about the development activities or pay her any of the proceeds.

When she did become aware of the drilling activity, Mrs. Gail filed an action against the co-owner and the developer in Ohio state court. She alleged that the oil and gas lease was "invalid" and that it therefore did not convey her interest in the property. She further alleged that she had not received any royalties from the lease and that the defendants had converted the gas and royalties for their own use. Mrs. Gail sought to recover damages for "royalties not paid to plaintiff to date pursuant to the oil and gas lease, and for plaintiff's share of all other value which defendant ... has derived from the oil and gas lease." Applts.App. at 78A. Finally, Mrs. Gail's complaint included a general prayer for compensatory damages for "trespass, fraud, oil and gas well royalties, and rental income under the lease." *Id.*

During closing argument, Mrs. Gail's attorney asked the jury to compensate Mrs. Gail for unpaid royalties and for the loss of choice as to whether to develop the land in the future. "They didn't give her the right to decide whether [the gas] should remain; didn't give her the right to decide what should be done with it, whether the property should be sold with those reserved [sic] on it. They just took her gas and oil." *Id.* at 104. At the close of the trial in the Ohio action, the trial court submitted fraud and conversion claims to the jury. Mrs. Gail prevailed, ultimately recovering $250,000 in compensa-

tory damages and $65,000 in punitive damages.[1]

When Mrs. Gail failed to declare the judgment as income, the government alleged a deficiency. Mrs. Gail paid the alleged deficiency and filed an action in United States District Court for the District of Utah seeking a refund pursuant to 28 U.S.C. § 1346. Although the government and Mrs. Gail agreed that the punitive damages should be characterized as income, they disagreed as to whether the compensatory damages should be characterized as income or a capital gain. In its summary judgment order, the district court noted that proceeds from a conversion judgment for gas in place are characterized as a capital gain while the proceeds from the production of gas are characterized as income. *See, e.g., Anderson v. Helvering,* 310 U.S. 404, 407, 60 S.Ct. 952, 954, 84 L.Ed. 1277 (1940) ("The production of oil and gas . . . is treated as an income-producing operation, not as a conversion of capital investment as upon a sale."). The district court next observed that while the jury instructions in the Ohio action did not state whether the conversion was of gas in place or gas removed, Mrs. Gail's attorney had used language in closing argument suggesting that Mrs. Gail was asking to be compensated for the value of the gas produced from her land. Specifically, the district court noted that her attorney had asked for "royalties." Based upon the complaint and the closing argument, the district court held that the judgment compensated Mrs. Gail for unpaid royalties for gas removed from the property rather than for the diminution in the value of her property, and therefore characterized the judgment as income.

## DISCUSSION

The only issue on appeal is whether the proceeds from the judgment should be characterized as income or a capital gain. This is a close question that few courts have examined in the oil and gas context. We review the district court's grant of summary judgment de novo. *Boone v. Carlsbad Bancorpo-*ration, Inc., 972 F.2d 1545, 1550 (10th Cir. 1992).

■ Our general rule for characterizing the proceeds of a judgment for tax purposes focuses upon what the judgment replaces. *Gilbertz v. United States,* 808 F.2d 1374, 1378 (10th Cir.1987). In making this inquiry, we ask: "In lieu of what were the damages awarded" and characterize the judgment accordingly. *Id.* (quoting *Raytheon Prod. Corp. v. C.I.R.,* 144 F.2d 110, 113 (1st Cir.), *cert. denied,* 323 U.S. 779, 65 S.Ct. 192, 89 L.Ed. 622 (1944)).

The most relevant Supreme Court case is *C.I.R. v. Gillette Motor Transport, Inc.,* 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960). In *Gillette,* the government took control of a taxpayer's trucking business during World War II to advance the war effort. When the Federal Claims Commission awarded the taxpayer damages for the period in which the government controlled the company, the taxpayer characterized the damage award as a capital gain. The *Gillette* Court disagreed, holding that the damage award was more like rent than it was the sale of a capital asset. *Id.* at 135, 80 S.Ct. at 1501. The Court reasoned that "[h]ad the Government taken a fee in those facilities, or damaged them physically beyond the ordinary wear and tear incident to normal use, the resulting compensation would no doubt have been treated as gain from the *involuntary* conversion of assets." *Id.* (citing *Henshaw v. C.I.R.,* 23 T.C. 176 (1954)) (emphasis added).

*Henshaw* is the leading oil and gas tax characterization case. In *Henshaw,* the taxpayers recovered a judgment when another party drilled on adjacent land connected to the same oil pool and destroyed the taxpayers' ability to recover oil from their property. The trial court that had presided over the conversion action had instructed the jury to determine the diminution of value to the taxpayers' property and the jury had found that the property had been damaged. Relying upon the rule that proceeds from oil and

---

1. The jury returned verdicts of $250,000 in compensatory damages and $250,000 in punitive damages against the fraudulent co-owner and the developer. After the final judgment, the parties settled the matter for $315,000. Mrs. Gail and the government agree that only $65,000 of the settlement represents punitive damages. The government allowed Mrs. Gail to take a 15% depletion allowance on the $250,000 of compensatory damages, but not the punitive damages.

gas in place are considered capital assets rather than income, the tax court held that the judgment should be considered a capital gain because the other party's action destroyed the value of oil reserves still in the ground. *Henshaw*, 23 T.C. at 181–82.

The government relies mainly upon *Henshaw* for the proposition that the pleadings and language of the Ohio action control the characterization of a judgment for tax purposes. We cannot agree that the potentially confusing language of the Ohio proceeding is dispositive in characterizing the entire judgment as income, for two reasons. First, while it may have been proper at the time of *Henshaw* to rely upon "magic words" in a complaint, notice pleading under the rules of civil procedure and the tax code now emphasize function instead of form, and economic reality rather than labels. *See, e.g., Alexander v. City of Chicago*, 994 F.2d 333, 340 (7th Cir.1993) (holding that there is no need to plead magic words in notice pleadings); *Kirchman v. C.I.R.*, 862 F.2d 1486, 1491 (11th Cir.1989) ("[T]he general notion that courts should look at the substance of a transaction rather than just its form" has become accepted.); *Carr Staley, Inc. v. United States*, 496 F.2d 1366, 1375 (5th Cir.1974) ("Taxation should be based on the economic realities of the particular commercial transaction involved."), *cert. denied*, 420 U.S. 963, 95 S.Ct. 1355, 43 L.Ed.2d 441 (1975).[2]

Second, the term "royalties" in the context of the conversion action is confusing and inconsistent with the district court's holding in this case. The government argues that Mrs. Gail used the term "royalties" in her complaint and that her attorney used the term three times in his closing statement in the Ohio action, suggesting that Mrs. Gail's suit sought royalties—which are clearly income—rather than compensation for the diminution of value for her property.

■ However, the government's reliance on the "royalties" language to characterize the entire judgment is difficult to reconcile with the usual use of that term and the size of the judgment. One commentator notes that royalties on oil and gas leases generally range from $3/16$ to $\frac{1}{8}$ depending upon the jurisdiction, the bargaining power of the parties, and the amount of bonus payments. Richard W. Hemingway, *Law of Oil and Gas* § 2.5, at 58 n. 89 (3d ed. 1991). In this case, the jury awarded Mrs. Gail more than the fractional value of production she would have received as a royalty. It is therefore clear that the jury did not only award Mrs. Gail royalties. In addition, *Gilbertz* suggests that the issue in this case is not whether Mrs. Gail's attorney used certain magic words in the Ohio action; the issue is whether Mrs. Gail's judgment actually represents gas production or the diminution to the value of her real property.[3]

■ Mrs. Gail makes two arguments in support of the proposition that she is entitled

---

2. At oral argument, the government conceded that its entire argument was based upon the "magic words" that Mrs. Gail's attorney used in his pleadings and at trial in the Ohio action. In fact, the government represented that it would not have contested Mrs. Gail's characterization of the judgment but for her attorney's language. We find the government's position inconsistent with the prevailing approach emphasizing economic reality rather than self-serving labels and question the wisdom of concentrating upon statements made during the heat of trial advocacy.

3. Examining the purpose of the capital gains tax does not add much light to the issue. "[T]he purpose behind capital gains treatment is to avoid the hardship of taxing as income in one year the entire gain due to appreciation of value of a capital asset over a considerable period of time." *Wood v. United States*, 377 F.2d 300, 304–05 (5th Cir.) (citing *Burnet v. Harmel*, 287 U.S. 103, 106, 53 S.Ct. 74, 75, 77 L.Ed. 199 (1932)), *cert. denied*, 389 U.S. 977, 88 S.Ct. 465,

19 L.Ed.2d 472 (1967). Ostensibly, this rationale would suggest that an oil and gas conversion action would produce income rather than capital gains. Indeed, in *Burnet*, the Supreme Court explicitly stated that the rationale behind the capital gains tax does not apply to the production of oil and gas:

> It is an incident of every oil and gas lease, where production operations are carried on by the lessee, that the ownership of the oil and gas passes from the lessor to the lessee at some time and the lessor is compensated by the payments made by the lessee.... But notwithstanding this incidental transfer of ownership, it is evident that the taxation of the receipts of the lessor as income does not ordinarily produce the kind of hardship aimed at by the capital gains provision of the taxing act. Oil and gas may or may not be present in the leased premises, and may or may not be found by the lessee. If found, their abstraction from the soil is a time-consuming operation and the

to characterize the entire judgment as a capital gain. She first argues that she is entitled to capital gains treatment because the conversion of her gas was involuntary like *Henshaw*. Mrs. Gail is inviting us to create a rule that all judgments in lieu of involuntary conversions be accorded capital gains treatment. We must decline this invitation because it is contrary to the more particularized inquiry we adopted in *Gilbertz*.

Mrs. Gail's second argument is that the entire judgment represents the diminution to the value of her real property and that she is therefore entitled to characterize the judgment as a capital gain. Again, she invokes *Henshaw*, maintaining that both cases involve involuntary conversions of oil and gas and that the only difference between her judgment and the judgment in *Henshaw* is that her gas has been extracted while the judgment in *Henshaw* was based upon actions that made the gas unrecoverable.[4]

■ In assessing this argument, it is helpful to consider the extraction of gas from Mrs. Gail's property in economic terms. Before the gas was extracted, if information were perfect, Mrs. Gail's property would have been appraised at roughly the value of the gas that could be produced from the land plus the residual value of the land for other

purposes, minus production costs.[5] If the jury awarded Mrs. Gail the value of the gas produced from her property as damages, she would then have had the value of the extracted gas and the value of the residual land. The only economic difference between the two scenarios would therefore be production costs, and production costs are irrelevant to our discussion.

These economic considerations suggest that Mrs. Gail's attorney's reference to the extracted gas in his closing argument in the Ohio action may simply have been an attempt to explain the degree of diminution in the value of the land to the jury. We also believe that the term "royalty" is too ambiguous to be dispositive as to the entire judgment in this case. In addition, we cannot think of any superior method of appraising the converted property in this case that does not reference the extracted gas. Finally, we agree with Mrs. Gail's attorney in the Ohio action that what Mrs. Gail actually lost was an option to develop her land in the future and that the loss of this option diminished the value of her real property. Mrs. Gail lost the choice as to whether, when, and how she would develop her land.[6]

We are therefore unwilling to conclude, as the government urges, that Mrs. Gail's successful prosecution of the Ohio action should

payments made by the lessee to the lessor do not normally become payable as the result of a single transaction within the taxable year, as in the case of a sale of property. *Burnet*, 287 U.S. at 106, 53 S.Ct. at 75. However, the judgment in this case is strikingly unlike the ordinary production of oil and gas that *Burnet* discusses because Mrs. Gail received all the proceeds of the gas production in a single year. For this reason, the tax consequences of this case seem more like those of a sale of land than a mineral lease.

4. Mrs. Gail also cites *Maixner v. C.I.R.*, 33 T.C. 191 (1959), for the proposition that an involuntary taking of private property that results in the diminution to the value of the land creates a capital gain rather than income. However, *Maixner* appears to be inconsistent with our decision in *Gilbertz v. United States*, 808 F.2d 1374 (10th Cir.1987). In *Gilbertz*, we held that damage to income-producing real property should be characterized as income because the damages replaced income. *Id.* at 1380 n. 8. In fact, we specifically noted in *Gilbertz* that the taxpayers admitted that the damage to the land for which they had been compensated resulted in lower annual income. *Id.* at 1377.

Mrs. Gail's claim, however, is not inconsistent with *Gilbertz*. Unlike the taxpayers in *Gilbertz* and *Maixner*, Mrs. Gail's land was an idle asset rather than income-producing property. Instead of losing annual income, Mrs. Gail lost the ability to sell her undeveloped land or develop her land as she chose in the future.

5. We are aware that the uncertainty regarding gas development would likely discount the sale value of the land until the gas reserves are confirmed. However, in this peculiar case, the jury was entitled to value the property based upon the information the illegal development made available.

6. To a large degree, equitable considerations also support Mrs. Gail's argument for treating the judgment as a capital gain in this case. But for the fraud and conversion, Mrs. Gail could have produced gas while taking advantage of a number of tax-minimizing strategies. If Mrs. Gail was wealthy, for example, she may have utilized tax planning and reduced her tax burden by making charitable contributions. If she was of more modest means, she would likely have the advantage of lower marginal income tax rates as

subject her to the highest marginal income tax rate for the production of oil and gas she did not choose to undertake, especially considering that the gas took a number of years to produce and that she had to accept the risks and costs of litigation to recover the judgment.[7] In our view, the government's approach would allow the government to benefit unjustly from Mrs. Gail's misfortune by acting as a free rider in her legal battle.

■ Nevertheless, we cannot agree with Mrs. Gail that the entire judgment should be characterized as a capital gain. In her complaint in the Ohio action, Mrs. Gail clearly sought to recover royalties under the fraudulently executed oil and gas lease. In addition, in instructing the jury, the Ohio trial court expressly defined royalties under an oil and gas lease as personal property, which can be converted and for which Mrs. Gail would be entitled to compensation.[8] Applts.App. at 87. Finally, the cash judgment provided Mrs. Gail with advantages, such as liquidity and the potential to diversify her investments, that an undeveloped tract of land does not.[9] It thus seems clear that Mrs. Gail ratified the fraudulent lease and

that some part of her judgment represented the royalties to which she was entitled under that lease.

## CONCLUSION

Based upon the foregoing analysis, we believe that the judgment represents both unpaid royalties and compensation for the diminution to the value of real property. We therefore hold that Mrs. Gail must characterize the royalties she would have received from the lease at issue as income, but that she is entitled to characterize the remainder of the judgment as a capital gain. This realistic approach to this difficult issue builds upon *Henshaw*, reconciles the confusing state court proceedings, recognizes the economic reality of the transaction, and has obvious equitable appeal as well.

We therefore REVERSE and REMAND to the district court to allocate the judgment between royalties under the contract and the diminution in value to Mrs. Gail's land.

suggested in *Burnet,* because the gas would have been produced over a number of years. Regardless, she could have maintained the land without developing it during her life and devised it after her death. The devisee could then have sold the land containing the gas reserves—perhaps without paying any taxes at all.

7. We note that it is more difficult for a taxpayer to avoid a taxable event under 26 U.S.C. § 1033 for the conversion of minerals than it would be for the conversion of other assets. In the case of securities, for example, it is a simple thing to replace shares of stock because they are fungible—one share of General Motors stock is as good as any other. Minerals, however, are unique, much like the real property to which they are attached. *See United States v. Peters,* 777 F.2d 1294, 1304 (7th Cir.1985) (Coffey, J., concurring and dissenting) (citing 5A *Corbin on Contracts* § 1143, at 126 (1964), and noting that specific performance is an appropriate remedy in a breach of contract case involving real property because land is unique). In addition to the difficulty of finding a suitable piece of land with comparable mineral resources, the transaction costs would likely be greater in the case of gas-producing land than it would be with securities. Whether Mrs. Gail could have avoided a taxable event under Section 1033 by investing in a fungible asset that does not distribute dividends, such as long-term gas futures, is an interesting ques-

tion commentators may wish to consider. Such an approach would have the advantages of restoring the taxpayer and the government to the positions they formerly occupied.

8. Ohio provides a constructive trust remedy in connection with forgery and fraud. *See Jacobsen v. Jacobsen,* 164 Ohio St. 413, 58 O.O. 239, 131 N.E.2d 833, 835 (1956) (citing *Seeds v. Seeds,* 116 Ohio St. 144, 156 N.E. 193 (1927)). It is therefore possible to conceptualize the Ohio action as having created a constructive trust to hold the royalties to which Mrs. Gail is entitled and then treating those royalties as income.

9. One could argue that Mrs. Gail received a larger share of the profits from the Ohio judgment than she would have had she simply received royalties, and that she was thus not disadvantaged by the defendant's action. However, this argument is not convincing for two reasons. First, Mrs. Gail might never have become aware of the conversion and also had to accept the risks and costs of litigation in order to recover the judgment. Second, the parties involved in these two matters are different. The Ohio action resolved the distribution of proceeds among Mrs. Gail, the fraudulent co-owner and the developer. This case, on the other hand, regards the distribution of Mrs. Gail's proceeds between Mrs. Gail and the government.