**F I L E D**

**PUBLISH**

**SEP 9 1999**

**UNITED STATES COURT OF APPEALS**

TENTH CIRCUIT

---

JEAN D. TRUE, individually and as personal representative of the estate of Henry A. True, Jr.; HENRY A. TRUE, III; KAREN S. TRUE, DIEMER D. TRUE; SUSAN L. TRUE; DAVID L. TRUE; MELANIE A. TRUE,

    Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA,

    Defendant-Appellee.

No. 98-8015

---

**Appeal from the United States District Court for the District of Wyoming (D.C. No. 96-CV-1050-J)**

---

Richard E. Day (Mark L. Carman of Williams, Porter, Day and Neville, P.C.; and Ronald M. Morris with him on the briefs) of Williams, Porter, Day and Neville, P.C., Casper, Wyoming, for Plaintiffs-Appellants.

Jonathan S. Cohen (Loretta C. Argrett, Assistant Attorney General, and Teresa T. Milton, Department of Justice, Washington, D.C.; David D. Freudenthal, United States Attorney for the District of Wyoming, Cheyenne, Wyoming, of counsel, with him on the briefs) of the Department of Justice, Washington, D.C., for Defendant-Appellee.

---

Before **TACHA, BARRETT** and **BRORBY**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

_____

Appellants, Jean D. True (individually and personal representative of the estate of Henry A. True, Jr.), Henry A. True III, Karen S. True, Diemer D. True, Susan L. True, David L. True, and Melanie A. True (hereinafter "taxpayers," "Trues," or "True family"), challenge the district court's summary judgment order in favor of the government, claiming the court erroneously applied the step transaction doctrine to invalidate certain business transactions they executed. In addition, Appellants argue the district court erred when it refused to apply the collateral estoppel doctrine to bar relitigation of particular issues decided in an earlier tax case involving the same parties.[1] We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm in part, reverse in part, and remand for further proceedings.[2]

_____

[1] This case originally included a cross-appeal designated No. 98-8018, which involved a dispute over pipeline depreciation. We need not address this matter because the parties stipulated to dismissal and the appeal was dismissed by order dated June 29, 1999. They agree our decision in _Duke Energy Natural Gas Corp. v. Commissioner_, 172 F.3d 1255 (10th Cir. 1999), filed during the pendency of this appeal, effectively settled the pipeline dispute.

[2] We reviewed the government's motion to dismiss this appeal for lack of jurisdiction and its arguments in support thereof, and conclude the motion should be denied.

I.       Background

This tax refund suit arises from the Trues' dispute with the Internal Revenue Service over the characterization of certain transactions involving several True family businesses.  The Trues engage in a variety of business ventures including oil and gas production and exploration, and ranching.  They conduct their family businesses primarily as general partnerships or Subchapter S Corporations, with Henry True, Jr. (prior to his death) and his wife, Jean, owning equal controlling interests, and their three sons, Henry, Diemer, and David, sharing equal minority interests in the ownership and operation of the businesses.[3] The family businesses involved in this case are True Ranches, a partnership engaged in ranching, farming, and feedlot operations; Smokey Oil Company, a Wyoming corporation engaged in oil and gas production and exploration; True Oil Company, a general partnership engaged in oil and gas production and exploration; and Bear Lodge Mountain Corporation and True Land and Royalty Company, two Subchapter S corporations the Trues organized to acquire and deal in oil and gas leases.

---

[3]  Karen S. True, Susan L. True, and Melanie A. True are parties to this lawsuit by virtue of having filed joint returns with their husbands, Henry, Diemer, and David, who are minority shareholders or partners in the True family businesses.

Two separate series of transactions involving the Trues' businesses are presently in dispute. The first involves a multi-stage purchase, exchange, and transfer involving ranchland properties (hereinafter "ranchland transactions"), and the second involves the acquisition and subsequent assignment of oil and gas leases in exchange for guaranteed minimum overriding royalty payments (hereinafter "oil and gas lease transactions"). In order to explain clearly the events giving rise to this suit, we summarize the transactions separately.

A.     Ranchland Transactions

During the 1980s, the True family purchased five new ranch properties to add to their ranching operations. Each purchase took place through the same series of steps, described as follows. First, instead of True Ranches directly acquiring the ranchlands, the taxpayers arranged for Smokey Oil Company to purchase the parcels of real property, while True Ranches acquired the operating assets of each ranch. Smokey Oil Company then transferred the ranchlands to True Oil Company in exchange for selected productive oil and gas leases. Internal Revenue Code § 1031 permitted the Trues to treat the exchange as a like-kind, tax-free exchange.[4] After the transfer, True Oil Company immediately

---

[4] The Internal Revenue Service has issued a Revenue Ruling stating improved ranchland and producing oil and gas leases are "like kind" properties for purposes of I.R.C. § 1031. Rev. Rul. 68-331, 1968-1 C.B. 352.

distributed the newly acquired ranchlands to the individual family-member partners of True Oil Company as tenants in common. The partners then contributed their undivided interests in the lands to True Ranches by general warranty deed. Internal Revenue Code §§ 721 and 731 allowed the Trues to treat these distributions as non-recognition transactions.

This series of acquisitions, transfers and exchanges had positive tax implications for the Trues. Through the operation of I.R.C. § 1031(d), which essentially provides that the basis of property received in a tax-free exchange is the same as the basis of the property transferred, Smokey Oil Company received depletable oil and gas leases with the same cost basis it had in the non-depreciable ranchland it transferred in the exchange with True Oil Company. This allowed Smokey Oil Company to claim cost depletion deductions for the leases on its tax returns for 1989 and 1990 under I.R.C. § 612, resulting in substantial tax savings for the True family. True Oil Company, on the other hand, received the non-depreciable ranchland with a zero basis because the oil and gas leases it exchanged pursuant to I.R.C. § 1031 were fully cost depleted. Through the subsequent transfers, True Ranches acquired the ranchland with the same zero basis as True Oil Company's oil and gas leases. Ultimately, the Trues reaped the tax benefits of turning non-depreciable assets (ranchlands) into cost-depletable

assets (oil and gas leases) in the hands of Smokey Oil Company, with the residual effect of ridding True Oil Company of fully cost-depleted assets (oil and gas leases) and leaving True Ranches with a zero basis in otherwise non-depreciable assets (ranchlands).

B.     Oil and Gas Lease Transactions

Employing a similar strategy, the Trues utilized Bear Lodge Mountain Corporation and True Land and Royalty Company to acquire and then assign numerous oil and gas leases. Neither of these entities had any employees, and they relied primarily on the land department of True Oil Company or independent landmen hired by True Oil Company to arrange the lease acquisitions. The Trues structured the transactions so that Bear Lodge Mountain Corporation and True Land and Royalty Company acquired the oil and gas leases, and shortly thereafter, assigned a 100 percent interest in the leases to either True Oil Company or Smokey Oil Company. In exchange, Bear Lodge Mountain Corporation or True Land and Royalty Company retained an overriding royalty of five percent, against which True Oil Company and Smokey Oil Company made annual advance royalty payments or "guaranteed minimum overriding royalty" payments over the life of the lease.

As a result of these transactions, True Oil Company and Smokey Oil Company deducted the guaranteed minimum overriding royalties paid to Bear Lodge Mountain Corporation and True Land and Royalty Company on their tax returns for 1989 and 1990 under Treas. Reg. § 1.612-3(b)(3). This arrangement allowed True Oil Company and Smokey Oil Company to realize the tax benefits of immediately expensing the guaranteed minimum overriding royalty payments instead of capitalizing the purchase of the leases as the Internal Revenue Code ordinarily requires for direct purchases of those type assets. On the other side of the transaction, even though the Internal Revenue Code required Bear Lodge Mountain Corporation and True Land and Royalty Company to report the guaranteed minimum overriding royalty payments as income they received in exchange for the oil and gas lease assignments, the companies could claim an offsetting cost depletion deduction under Treas. Reg. § 1.612-3(b)(1). This maneuvering resulted in an overall tax advantage for the True family businesses that passed through to the individual taxpayers.

C.    Internal Revenue Service Proceedings

Suspicious of both the ranchland and oil and gas lease transactions, the Internal Revenue Service audited the Trues' tax returns for tax years 1989-1990. As a result of the audit, the Internal Revenue Service recharacterized both the

ranchland transactions and oil and gas lease transactions, denying the Trues the described tax benefits associated with them.

The Internal Revenue Service treated the ranchland transactions as if True Ranches had acquired the property in the first instance, and thus assigned True Ranches the same basis in the property as the amount Smokey Oil Company paid to acquire the land. The Internal Revenue Service also disallowed the cost depletion deductions Smokey Oil Company took for the leases acquired from True Oil Company in the tax-free exchange. Instead, the Internal Revenue Service allocated the income from those leases to True Oil Company and allowed True Oil Company to take percentage depletion deductions, rather than the cost depletion Smokey Oil Company originally claimed.

As for the oil and gas lease transactions, the Internal Revenue Service treated True Oil Company and Smokey Oil Company as having directly acquired the leases instead of Bear Lodge Mountain Corporation and True Land and Royalty Company. Accordingly, the Internal Revenue Service (1) disallowed True Oil Company's and Smokey Oil Company's guaranteed minimum overriding royalty deductions, and (2) required the companies to treat the cost of acquiring the leases as capital expenditures. The Internal Revenue Service allowed Bear

Lodge Mountain Corporation and True Land and Royalty Company to exclude the guaranteed minimum overriding royalty income, but did not permit the companies to claim a deduction for cost depletion.

The Trues paid under protest the deficiency from the 1989 and 1990 tax years as determined by the Internal Revenue Service audit, and then promptly filed an administrative claim for a refund. After the Internal Revenue Service disallowed the refund, the taxpayers filed the present refund suit in district court.

D.    District Court Proceedings

In proceedings before the district court, the government filed motions for partial summary judgment contending, under the step transaction doctrine, the court must: (1) treat the series of exchanges and transfers involved in the ranchland purchases as a single transaction wherein True Ranches alone acquired the property, and (2) construe the assignment of oil and gas leases from Bear Lodge Mountain Corporation and True Land and Royalty Company to True Oil Company and Smokey Oil Company as a single transaction wherein True Oil Company and Smokey Oil Company directly obtained the leases. In opposition to these motions, the Trues argued that the business transactions had independent economic significance, bona fide business purposes, and, in any event, presented

issues of fact inappropriate for summary judgment. In addition, the Trues filed

their own motion for partial summary judgment arguing on collateral estoppel

grounds that earlier litigation and final judgment in a previous tax case

(hereinafter "1973-1975 tax case"), involving the same parties and same issues as

those involved in the present dispute over the oil and gas lease transactions,

barred the government from relitigating those issues.[5]

The district court rejected the Trues' collateral estoppel argument, finding

changes in controlling legal principles since the 1973-1975 tax case precluded its

application in this case. Then, the court granted the government's motions for

summary judgment, finding the step transaction doctrine required the

recharacterization of both the ranchland transactions and the oil and gas lease

transactions in the way the government requested.

---

[5] In the 1973-1975 tax case, True family members assigned oil and gas leases to True Oil Company in exchange for guaranteed minimum overriding royalty payments. As in the present case, True Oil Company deducted the guaranteed minimum overriding royalties paid while the recipient recognized the amount as income and took a cost depletion deduction against the income received. The government challenged this arrangement, but a jury decided the guaranteed minimum overriding royalty payments True Oil Company "made to [True] family members were entered into for valid and substantial business purposes having economic reality." *True v. United States*, 629 F. Supp. 881, 885 (D. Wyo. 1986). Thus, the court ratified the Trues' treatment of the advanced royalty payments. *Id*.

II.     Discussion

On appeal, the taxpayers argue the district court:  (1) erred in ruling as a matter of law that the step transaction doctrine required True Ranches to be treated as the purchaser of the ranchland, thereby denying the economic benefits and advantageous tax treatment of the transactions; (2) erred in precluding the application of collateral estoppel to the dispute over the tax treatment of the oil and gas lease transactions; and (3) erred in deciding as a matter of law that, under the step transaction doctrine, the payment of guaranteed minimum overriding royalties should be collapsed into a single transaction.  We review de novo the district court's order granting summary judgment, employing the same legal principles as the district court and construing the factual record and the reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  *See Byers v. City of Albuquerque* 150 F.3d 1271, 1274 (10th Cir. 1998).  Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of material fact is genuine only if a party presents facts sufficient to show that a reasonable jury could find in favor of the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A.    Collateral Estoppel

We first examine whether judgment in the 1973-1975 tax case precludes the government from relitigating the issue of the deductibility of the guaranteed minimum overriding royalty payments in the context of the oil and gas lease transactions.  In opposition to the Trues' collateral estoppel claim, the government initially argues the district court lacked subject matter jurisdiction over the issue because the Trues failed to raise this argument in their administrative refund filing.  The district court did not address this jurisdictional challenge, and instead found collateral estoppel inapplicable on other grounds.  We find it necessary to address the jurisdictional contention.

Internal Revenue Code § 7422(a) provides "[n]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected ... until a claim for refund or credit has been duly filed with the Secretary."  The claim for refund "must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." Treas. Reg. § 301.6402-2(b)(1); *see also Herrington v. United States*, 416 F.2d 1029, 1032 (10th Cir. 1969) (burden is on the claimant to bring asserted grounds of recovery to the Internal Revenue Service; the Commissioner is not required to "ferret out

possible grounds for relief which a taxpayer might assert"). Under these rules, if the taxpayer does not adequately raise an issue at the administrative level, the courts have no jurisdiction to consider the issue in a later suit for refund. *In re Estate of Bird*, 534 F.2d 1214, 1219 (6th Cir. 1976); *see also Alabama By-Products Corp. v. Patterson*, 258 F.2d 892, 900 (5th Cir. 1958), *cert. denied*, 358 U.S. 930 (1959). These requirements serve to apprise the Internal Revenue Service of the nature of the claim and its underlying facts, so that it can make a thorough administrative investigation and determination, correct any errors, and "'limit the scope of any ensuing litigation to those issues which have been examined and which [it] is willing to defend.'" *Stelco Holding Co. v. United States*, 42 Fed. Cl. 101, 108 (1998) (quoting *Union Pacific R.R. Co. v. United States*, 389 F.2d 437, 442 (Ct. Cl. 1968)); *see also McKart v. United States*, 395 U.S. 185, 194-95 (1969) (generally addressing administrative exhaustion requirements to promote the practical notions of judicial efficiency, administrative autonomy, and effective agency procedures).

Neither the parties nor our own research reveals any controlling authority specifically addressing whether a taxpayer must raise a collateral estoppel claim in the course of filing an administrative tax refund in order to preserve the issue for appeal. Thus, we treat this as an issue of first impression.

In support of its position that the Trues must plead collateral estoppel in the administrative filing, the government relies solely on the plain language of I.R.C. § 7422(a) and Treas. Reg. § 301.6402-2(b), and asserts the Trues did not "set forth in detail each ground upon which a credit or refund is claimed." The Trues counter this argument, relying on *Parke, Davis & Co. v. United* States, 1975 WL 787, 76-1 USTC (CCH) ¶ 9280 (E.D. Mich. 1975) (quoting *National Forge & Ordnance Co. v. United States*, 151 F. Supp. 937 (Ct. Cl. 1957)), for the proposition they are not required to state their claims for a refund with any degree of particularity, and their failure to specifically include collateral estoppel does not preclude them from raising the issue in this present litigation. In addition, the Trues argue that because the Internal Revenue Service knew or should have known about the earlier lawsuit from a review of its own records and would suffer no prejudice from the application of collateral estoppel, it cannot now evade its application.

The Trues' reliance on *Parke, Davis & Co.* is misplaced. *Parke, Davis & Co.* and the cases cited therein

> merely stand for the proposition that an issue raised in litigation, but not specifically referred to in the refund claim, *might be permitted*, if the newly raised issue was subsidiary to, or an integral part of, the grounds presented in the refund claim such that the omitted issue must have necessarily been considered by the [Internal Revenue Service] in its review of the refund claim.

-14-

*Lockheed Martin Corp. v. United States*, 39 Fed. Cl. 197, 201 (1997) (emphasis added). The estoppel claim in *Parke, Davis & Co.* clearly was subsidiary to, or an integral part of, the refund claim wherein the taxpayer alleged the Internal Revenue Service arbitrarily and capriciously changed its position as documented in a previous ruling letter that the taxpayer requested, and upon which the taxpayer relied. Such is not the case here.

The Trues do not attempt to estop the Internal Revenue Service from changing its position on the tax treatment to be afforded the oil and gas lease transactions subject to the 1989-1990 audit. Indeed, the Internal Revenue Service never has adopted the Trues' position on that issue. The Trues instead attempt to bind the Internal Revenue Service to the judicial disposition of a percentage depletion issue involving guaranteed overriding royalty payments in an independent case litigated some fifteen years earlier. We fail to see how the Internal Revenue Service would necessarily have considered the judicial disposition in the 1973-1975 tax case when reviewing the refund claim presently at issue. Unlike the situation in *Parke, Davis & Co.*, we construe the Trues' collateral estoppel claim to be an independent ground upon which to base their refund claim, not an "issue subsidiary to, or an integral part of," other substantive claims they raised in the administrative proceeding. Accordingly, the Trues

should have raised collateral estoppel as a distinct ground for a refund in the course of filing their administrative refund claim.

As for the Trues' argument that the Internal Revenue Service's knowledge of the prior lawsuit excuses their failure to raise the issue in their administrative refund claim, we conclude that in order to preserve the collateral estoppel issue for our review, "[i]t is not enough that in some roundabout way the facts supporting the claim may have reached" the attention of the Internal Revenue Service. *Levitsky v. United States*, 27 Fed. Cl. 235, 241 (1992). The Trues must demonstrate the Internal Revenue Service not only knew of the preclusive effect of the prior litigation, but also that the Service "understood that a claim was being made *based upon*" those grounds. *Id.* (emphasis added). Thus, even if the Internal Revenue Service knew about the prior case, it was still incumbent on the Trues to make it plain they based their refund claim in part upon the prior decision.

Having reviewed the parties' arguments and the cases generally dealing with the requirements of an administrative tax appeal, we hold the Trues cannot assert collateral estoppel for the first time in federal court, because they failed to raise the issue in the course of their administrative refund filing. *See James v.*

-16-

*Chater*, 96 F.3d 1341, 1343 (10th Cir. 1996) (issues omitted from an administrative appeal are deemed waived for purposes of subsequent judicial review); *Brown v. United States*, 890 F.2d 1329, 1346 (5th Cir. 1989) ("[A] taxpayer is barred from raising in a refund suit grounds for recovery not clearly and specifically set forth in its claim for a refund."). Although we do not believe it was necessary for the Trues to expressly use the words "collateral estoppel" in their refund claim in order to preserve the issue, they should have presented enough information to give the Internal Revenue Service notice they intended to rely on the preclusive effect of the prior litigation as a basis for their refund claim. *See Charter Co. v. United States*, 971 F.2d 1576, 1579-80 (11th Cir. 1992) ("[a]lthough crystal clarity and exact precision are not demanded," the taxpayer must identify in its refund claim the "essential requirements" of the refund demand). In other words, the Trues should have made at least some reference to the preclusive effect of the 1973-1975 tax case during the course of their administrative claim. The Trues' failure to specifically invoke collateral estoppel or at least reference the prior judgment left the Internal Revenue Service, as the reviewing agency, without sufficient notice of their intent to rely on the prior decision and its potential preclusive effect on issues in the present case. The Supreme Court has consistently and strictly held "[a] reviewing court usurps the agency's function when it sets aside the administrative determination upon a

-17-

ground not theretofore presented and deprives [it] of an opportunity to consider

the matter, make its ruling, and state the reasons for its action." *Unemployment*

*Compensation Comm'n v. Aragan*, 329 U.S. 143, 155 (1946); *see also Wilson v.*

*Hodel*, 758 F.2d 1369, 1372-73 (10th Cir. 1985). We will not usurp the Internal

Revenue Service's function by resolving a collateral estoppel claim not previously

considered in the administrative proceeding. For these reasons, we decline to

consider the Trues' collateral estoppel claim on appeal.

B.      Substance Over Form Principle – Overview

We must now determine whether the Trues' business activities pass for

legitimate tax avoidance and sound financial planning, or whether they constitute

manipulation of the intent and purpose of the tax code.[6] In order to ensure proper

---

[6] We emphasize, as a prelude to our substance over form analysis, "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits." *Gregory v. Helvering*, 293 U.S. 465, 469 (1935). A tax-avoidance motive for structuring a transaction in a particular way is not inherently fatal, and nothing in this opinion is intended to invalidate otherwise legitimate tax planning strategies. However, the structure of the Trues' transactions, coupled with their familial relationships and common ownership of the businesses involved, compels us to exercise a heightened level of skepticism and scrutiny in this matter. *See Kornfeld*, 137 F.3d 1231, 1235 (10th Cir. 1998) (where the "parties to the transactions in question are related, the level of skepticism as to the form of the transaction is heightened, because of the greater potential for complicity between related parties in arranging their affairs in a manner devoid of legitimate motivations." (Quotation marks and citation omitted.)), *cert. denied*, 119 S. Ct. 171 (1998); *Milbrew, Inc. v. Commissioner*, 710 F.2d 1302, 1305 (7th Cir. 1983) ("When persons who are not

-18-

tax treatment for the ranchland transactions and oil and gas lease transactions, we apply the substance over form principle. *See Commissioner v. Hansen*, 360 U.S. 446, 461 (1959) ("the incidence of taxation depends upon the substance, not the form, of the transaction"). This fundamental tax principle operates to prevent "'the true nature of a transaction [from being] disguised by mere formalisms, which exist solely to alter tax liabilities,'" and promotes "'the effective administration of the tax policies of Congress.'" *Kornfeld*, 137 F.3d at 1234 (quoting *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945)). Thus, applying the substance over form principle to the complex series of ranchland and oil and gas lease transactions in dispute in this case, we must look beyond the taxpayers' characterization of isolated, individual transactional steps, and also review the substance of each series of transactions in its entirety.

Deciding "whether to accord the separate steps of a complex transaction independent significance, or to treat them as related steps in a unified transaction,

---

dealing with each other at arm's length enter into a transaction that gives them tremendous tax savings, the Internal Revenue Service is entitled to be suspicious of the genuineness of the transaction."). "While it is true that a taxpayer can structure a transaction to minimize tax liability under the Internal Revenue Code, that transaction must nevertheless have economic substance in order to be the thing which the statute intended." *Kirchman v. Commissioner*, 862 F.2d 1486, 1491 (11th Cir. 1989) (quotation marks and citation omitted).

is a recurring problem in the field of tax law." *King Enters., Inc. v. United States*, 418 F.2d 511, 516 (Ct. Cl. 1969). In search of an answer to this problem, courts utilize a variety of approaches, including a particular incarnation of the basic substance over form principle known as the step transaction doctrine. Simply stated, the step transaction doctrine provides that "interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction." *Commissioner v. Clark*, 489 U.S. 726, 738 (1989) (quotation marks and citation omitted); *see also Security Indus. Ins. Co. v. United States*, 702 F.2d 1234, 1244 (5th Cir. 1983) ("The step transaction doctrine is a corollary of the general tax principle that ... taxation depends on the substance of a transaction rather than its form."). The doctrine requires us to link together "all interdependent steps with legal or business significance, rather than [take] them in isolation," so that "federal tax liability may be based on a realistic view of the entire transaction."[7] *Clark,* 489 U.S. at 738 (quotation marks and citation omitted). We proceed, then, to examine the series of potentially interrelated steps involved in both the ranchland transactions and oil and gas lease transactions, utilizing this approach.

---

[7] While traditionally utilized in the context of corporate liquidation-reorganizations, courts also have applied the step transaction doctrine to various other kinds of taxpayer activities. Jacob Mertens, Jr., The Law of Federal Income Taxation § 43.253 (1997).

C.	Step Transaction Doctrine

Courts have developed three tests for determining when the step transaction doctrine should operate to collapse the individual steps of a complex transaction into a single integrated transaction for tax purposes: (1) end result, (2) interdependence, and (3) binding commitment. *See Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1522 (10th Cir.1991). More than one test might be appropriate under any given set of circumstances; however, the circumstances need only satisfy one of the tests in order for the step transaction doctrine to operate. *See id.* at 1527-28 (finding end result test inappropriate, but applying the step transaction doctrine using the interdependence test). Given the type of transactions involved in this case, only the end result and interdependence tests are relevant to our analysis.[8]

The end result test combines "into a single transaction separate events

_____

[8] The binding commitment test is seldom utilized, and only applies to situations "where the taxpayer is subject to an obligation or binding commitment, at the time the first step is entered into, to pursue the successive steps in a series of transactions," usually spanning several years. *See* Jacob Mertens, Jr., *supra* n.7, § 43.256 (1997). As a general rule, "the binding-commitment test is only applicable where a substantial period of time has passed between the steps that are subject to scrutiny." *Id*. Because the transactions in the present case do not span a long period of time or involve a binding commitment to pursue successive steps, we do not analyze them under this test. *See Associated Wholesale Grocers*, 927 F.2d at 1522 n.6 (rejecting use of binding commitment test because the case did not involve a series of transactions spanning several years).

which appear to be component parts of something undertaken to reach a particular result." *Kornfeld,* 137 F.3d at 1235; *Associated Wholesale Grocers,* 927 F.2d at 1523. Under this test, if we find the series of closely related steps in a transaction are merely the means to reach a particular result, we will not separate those steps, but instead treat them as a single transaction. *Kanawha Gas & Utils. Co. v. Commissioner*, 214 F.2d 685, 691 (5th Cir.1954). The taxpayer's subjective intent is especially relevant under this test because it allows us to determine whether the taxpayer directed a series of transactions to an intended purpose. *See Brown v. United States*, 782 F.2d 559, 563 (6th Cir. 1986) ("[e]nd result test" for determining when to apply "step transaction doctrine" makes intent a necessary element for application of doctrine). The intent we focus on under the end result test is not whether the taxpayer intended  to avoid taxes. Prior case law clearly instructs that tax reduction and avoidance motives are permissible and do not alone invalidate a transaction. *Gregory*, 293 U.S. at 469. Instead, the end result test focuses on whether the taxpayer  intended to reach a particular result by structuring a series of transactions in a certain way.[9] *See King Enters*., 418 F.2d

---

[9] We emphasize that under the end result test, our focus is not on the legitimacy of the intended result, but instead on whether the taxpayer undertook multiple steps to achieve a particular result. Thus, if a taxpayer engages in a series of steps that achieve a particular result, he cannot request independent tax recognition of the individual steps unless he shows that at the time he engaged in the individual step, its result was the intended end result in and of itself. If this is not what the taxpayer intended, then we collapse the series of steps and only give

at 516.

The interdependence test takes a slightly different approach. Under this test, we disregard the tax effects of individual transactional steps if "it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts." *Kuper v. Commissioner*, 533 F.2d 152, 156 (5th Cir. 1976). The interdependence test relies to a lesser degree on the taxpayer's subjective intent than the end result test. It focuses not on a particular result, but on the relationship between the individual steps and "whether under a reasonably objective view the steps were so interdependent that the legal relations created by one of the transactions seem fruitless without completion of the series." *Kornfeld,* 137 F.3d at 1235. In order to maintain this objectivity and ensure the steps have independent significance, we find it useful to compare the transactions in question with those we might usually expect to occur in otherwise bona fide business settings. *See Merryman v. Commissioner*, 873 F.2d 879, 881 (5th Cir. 1989).

Prior to our application of the end result and interdependence tests, we note

---

tax consideration to the intended end result. *See Crenshaw v. United States*, 450 F.2d 472, 475 (5th Cir. 1971), *cert. denied*, 408 U.S. 923 (1972).

the Trues initially challenge the district court's summary judgment rulings for reasons collateral to that court's step transaction analysis. First, the Trues argue the evidence they produced in response to the government's motion for summary judgment created issues of fact pertaining to their intentions underlying the ranchland transactions and oil and gas lease transactions sufficient to preclude summary judgment. The Trues contend the district court inappropriately granted summary judgment by casting their uncontroverted testimonial evidence as mere argument, drawing inferences in favor of the moving party, and generally treating the case as if it was ruling on the issues following a bench trial instead of a motion for summary judgment.

Cases involving the issue of substance over form require resolution of significant questions of fact.[10] Nevertheless, the mere presence of a factual question does not automatically preclude summary judgment. Even in cases where some issues of fact remain, if no reasonable fact-finder could find in favor

---

[10] Like the overall question of substance over form embodied by the step transaction doctrine, the issues involved in our application of the end result and interdependence tests, especially with regard to the taxpayer's intent, are undeniably questions of fact. *Kornfeld*, 137 F.3d at 1234 (substance of transaction treated as question of fact); *Weisbart v. Commissioner*, 564 F.2d 34, 37 (10th Cir. 1977) (same); *Brown*, 782 F.2d at 564 (taxpayer's intent is a question of fact).

of the non-moving party, then summary judgment is still appropriate. *See Anderson*, 477 U.S. at 247-248. As we have often iterated, the issue must be "a genuine dispute over a material fact." *Bingaman v. Kansas City Power & Light Co.*, 1 F.3d 976, 980 (10th Cir. 1993) (quotation marks and citation omitted). In some cases there is no dispute of fact, because "[the evidence] is so one-sided that one party must prevail as a matter of law." *Id*. As explained more fully below, this is precisely what occurred in this case. The district court did not reduce the Trues' evidence to mere argument, improperly weigh evidence, or otherwise ignore fundamental principles of summary judgment. Instead, the court acknowledged all the evidence and arguments from both parties and then, in accord with summary judgment standards, simply determined the evidence was so one-sided that no genuine issue of material fact remained in dispute. For this reason, we reject the Trues'
threshold argument that the district court ignored fundamental summary judgment principles.

In a second threshold argument, the Trues contend their evidence of legitimate business purposes and corresponding economic effects pertaining to the ranchland transactions and oil and gas lease transactions renders the step transaction doctrine inapplicable altogether. The Trues assert economic realities

must govern, and if a legitimate non-tax business purpose motivates a transaction or actually causes some economic effects, then the transaction is endued with substance that resolves the substance over form inquiry without the need to engage the step transaction analysis.

We acknowledge the Trues' evidence of business purpose and economic effects. However, we do not agree with their conclusion that business purposes and economic effects relating to the individual steps in each complex series of transactions preclude application of the step transaction doctrine in this instance.[11] The substance over form inquiry is not nearly as narrow as the Trues suggest. To ratify a step transaction that exalts form over substance merely because the taxpayer can either (1) articulate some business purpose allegedly

_____

[11] The Trues' evidence and arguments regarding business purpose and economic effects raise issues more relevant to a sham transaction doctrine analysis than a step transaction doctrine analysis . Although both the step transaction and sham transaction doctrines are corollaries of the basic substance over form principle, *see Kirchman*, 862 F.2d at 1491; *Security Indus.*, 702 F.2d at 1244, the sham transaction doctrine focuses on whether a questionable transaction has a business purpose and economic effects other than the creation of tax benefits, *Kirchman*, 862 F.2d at 1492. *See also Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978); *James v. Commissioner*, 899 F.2d 905, 908 (10th Cir. 1990). As described above, the step transaction doctrine is particularly tailored to the examination of transactions involving a series of potentially interrelated steps for which the taxpayer seeks independent tax treatment. Consequently, the step transaction doctrine provides the pertinent analytical framework in this case.

motivating the indirect nature of the transaction or (2) point to an economic effect resulting from the series of steps, would frequently defeat the purpose of the substance over form principle. Events such as the actual payment of money, legal transfer of property, adjustment of company books,[12] and execution of a contract all produce economic effects and accompany almost any business dealing. Thus, we do not rely on the occurrence of these events alone to determine whether the step transaction doctrine applies. Likewise, a taxpayer may proffer some non-tax business purpose for engaging in a series of transactional steps to accomplish a result he could have achieved by more direct means, but that business purpose by itself does not preclude application of the step transaction doctrine. *Associated Wholesale Grocers,* 927 F.2d at 1527. Although the absence of economic effects or business purposes may be fatal to a taxpayer's step transaction refund suit, the presence of those factors is not dispositive. *See id.* at 1526-27. We must still examine the objective realities of the multi-step transactions to determine their tax status, and proceed to do so under the end result and interdependence tests.

---

[12] Just as we reject the Trues' argument that the effect on their companies' books automatically gives the transaction economic substance, so too do we reject the government's notion that a transaction has no economic substance if it is possible for the taxpayer to merely adjust his books to reflect the Internal Revenue Service's recharacterization of the disputed transaction.

D.    The "End Result" and "Interdependence" Tests

1.    Ranchland Transactions

Applying the end result test to the ranchland transactions, we examine whether the Trues intended from the outset to place the ranchlands in the hands of True Ranches. Recall that the individual tax significance of each step of a multi-step transaction is irrelevant when, considered as a whole, the steps accomplish but a single intended result, which in actual purpose and effect is subject to the given tax consequence. *See Crenshaw*, 450 F.2d at 476. Thus, if the intended end result was for True Ranches to own the ranchland, then the Trues cannot claim a right to favorable tax treatment for the various intermediate transactions leading up to that intended result. If, on the other hand, the Trues present evidence showing they initiated the ranchland acquisition with another objective in mind (*i.e.*, the intended end result was actually one of the intermediate transactional steps), then they have created a genuine issue of whether that intermediate step should be afforded favorable tax treatment.

This analysis is inherently factual; however, as we emphasized above, the mere existence of a fact question does not render summary judgment inappropriate. If the proffered evidence is so one-sided that no reasonable fact finder could conclude anything other than that the Trues intended from the outset

-28-

for the True Ranches to acquire additional ranchlands through a series of separate, otherwise unnecessary conveyances, then summary judgment applying the step transaction doctrine to collapse that multi-step transaction for tax purposes is appropriate.

The Trues present evidence showing they intended to expand the land holdings of True Ranches through a series of transactions so that the elder Trues (Henry A. True, Jr. and Jean D. True), who had more liquid assets readily available to finance the acquisition, would contribute a greater share of the purchase price.[13] The Trues emphasize that if the court applies the step transaction doctrine to collapse the ranchland transactions, then the value equivalent to the purchase price of the properties will vanish from Smokey Oil Company's books. This in turn will deprive Henry and Jean True (elder Trues) of any compensation for the additional amount they contributed to the purchase of the ranch properties, as well as the correspondingly greater share in profits they stood to realize from Smokey Oil Company's ownership of the oil and gas leases

---

[13] Because Henry and Jean True (elder Trues) owned a substantially larger percentage interest in Smokey Oil Company (96.5%) than in True Ranches (73.9%), purchasing the ranchlands through Smokey Oil Company allowed the elder Trues to contribute a correspondingly greater share of the purchase price than the minority shareholders/partners.

acquired in the exchange with True Oil Company.

As mentioned above, we do not dispute the business purposes and economic effects the Trues cite; nevertheless we conclude those factors do not preclude summary judgment  based on the overwhelming evidence of the Trues' intent to achieve a particular end result.  The Trues admit they intended from the beginning to ultimately place the ranch properties in the hands of True Ranches.  This intent is further evidenced by the fact the ranchland was conveyed to Smokey Oil Company separate from the ranch operating assets, which True Ranches acquired directly. The fact the Trues arranged the steps so the elder Trues would bear a greater percentage of the acquisition cost does not establish an alternative intended end result, but merely demonstrates a financing consideration for structuring the transaction in a particular way.  If the intended end result was in question, then the business purposes and economic effects the Trues demonstrate might be probative, but in this case there is no doubt the Trues designed and executed a series of steps to increase the land holdings of True Ranches.  Thus, applying the end result test, the Internal Revenue Service must give tax consideration only to that intended result.   *Cf. Security Indus.*  , 702 F.2d at 1245-46.

We reach the same conclusion reviewing the ranchland transactions under the interdependence test. Under this test, we objectively examine each step of the ranchland transactions to see whether the legal relations created by one of the steps seem fruitless without completion of the overall transaction. *See Kornfeld,* 137 F.3d at 1235. If the steps have "reasoned economic justification standing alone," then summary judgment under the interdependence test is inappropriate. *Security Industrial*, 702 F.2d at 1247. However, if the only reasonable conclusion from the evidence is that the steps have "meaning only as part of the larger transaction," then the step transaction doctrine applies as a matter of law. *Id*. at 1246.

We conclude the steps involved in the ranchland transactions lack any reasoned economic justification standing alone. The record indicates Smokey Oil Company is involved only in oil and gas exploration and production. Thus, in the absence of evidence that Smokey Oil Company acquired the mineral rights beneath the ranchlands and believed oil or gas to be beneath those lands, its purchase of ranchland properties makes no objective business sense. In other words, there was no apparent purpose for Smokey Oil Company to purchase the ranchlands other than to facilitate the eventual placement of the property into the hands of True Ranches.

The exchange of producing oil and gas leases for the ranchlands between Smokey Oil Company and True Oil Company is similarly suspect. Like Smokey Oil Company, True Oil Company was not involved in ranching, and it had no apparent reason to exchange its oil and gas leases for ranch property other than to facilitate the transfer of the ranch property to True Ranches. The Trues argue the purpose of moving the oil and gas leases from one of their oil companies (True Oil Company) to another oil company (Smokey Oil Company) in exchange for ranchland was to allow Smokey Oil Company to grow as an operating entity; but that does not explain why True Oil Company, purporting to operate as a separate entity with its own interests to promote, would accept ranch properties in exchange for productive oil and gas leases. From the perspective of True Oil Company, an entity without any interest in ranch property, this step appears pointless without contemplation of the overall transaction.

None of the individual steps in the ranchland transactions is the type of business activity we would expect to see in a bona fide, arm's length business deal between unrelated parties, and none of them makes any objective sense standing alone without contemplation of the subsequent steps in the transaction.[14]

_____

[14] We emphasize in response to the cases the Trues cite highlighting the validity of various I.R.C. § 1031 exchanges, that our opinion has no impact on the legality of individual like-kind exchanges. A like-kind exchange, standing alone,

Each step in the ranchland transactions "led inexorably to the next," and thus "clearly satisf[ied] the 'interdependence' test for application of the step transaction doctrine ." *Security Indus.*, 702 F.2d at 1247.

Having reviewed the objective realities of the ranchland transactions, we conclude under either the end result or interdependence test, the step transaction doctrine applies. The Trues recognized that a large cash outlay for the direct purchase of the ranchlands through True Ranches would not result in any depreciation deductions. Consequently, they juggled the ownership of the ranchlands between their various business entities in order to produce a more favorable tax result, while still placing the ranchlands in the hands of True Ranches. By channeling the acquisition and exchange of the ranchlands through Smokey Oil Company and True Oil Company using a series of unnecessary

---

is unproblematic. However, if a taxpayer engages in an I.R.C. § 1031 exchange as part of an overall plan involving a series of transactional steps designed and executed to accomplish an end result beyond the exchange, and which otherwise exalts form over substance and defeats the clear intent of the Internal Revenue Code, then the Internal Revenue Service is entitled to challenge the transaction. In the present case, the problem is not with the oil and gas lease/ranchland exchanges, but with the Trues' use of those exchanges along with the other transactional steps to turn an expenditure for non-depreciable land into a depletable, stepped-up basis in oil and gas leases. End result and interdependence analysis does not invalidate complex or multiple-party § 1031 exchanges standing alone, only those forming part of an otherwise invalid step transaction.

exchanges and transfers, the Trues ended up with True Ranches holding a zero basis in the newly-purchased ranchlands and Smokey Oil Company holding a substituted, stepped-up basis in depletable oil and gas leases. We believe no reasonable juror could find these steps were anything but the Trues' prearranged, integrated plan to accomplish indirectly tax advantages they could not accomplish directly. *See Crenshaw*, 450 F.2d at 475 (a taxpayer may not secure, by a series of contrived steps, different tax treatment than if he had carried out the transaction directly). The Trues changed what would have been the natural result of a direct purchase of the ranchland by engaging in a series of steps designed from the outset to circumvent the intent of the tax code . Fundamental principles of taxation dictate that "[a] given result at the end of a straight path is not made a different result because reached by following a devious path." *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938). Consequently, we affirm the district court's decision to ignore the indirect route of the individual steps, view the ranchland transactions in their entireties, and treat them as direct purchases by True Ranches.

2.    Oil and Gas Lease Transactions

The applicability of the step transaction doctrine to the oil and gas lease transactions under the end result test also turns on the fact question of the

taxpayers' intent – specifically, whether the Trues intended to acquire leases in the ordinary course of their lease brokering business or to accomplish the end result of placing the oil and gas leases in the hands of True Oil Company or Smokey Oil Company. *See, e.g., Brown*, 782 F.2d at 564 (making application of step transaction doctrine under the end result test turn on the intent of the taxpayer from the outset of the transaction in question). Again, we acknowledge this inquiry involves significant questions of fact. Nevertheless, summary judgment is appropriate if the evidence is so one-sided that no reasonable finder of fact could find in favor of the non-moving party. *See Anderson*, 477 U.S. at 247-248.

The evidence of the Trues' intended end result with regard to the oil and gas lease transactions is not nearly as one-sided as it was in the case of the ranchland transactions. The record shows that at the time Bear Lodge Mountain Corporation or True Land and Royalty Company acquired an oil and gas lease, the Trues did not know to which exploration and production entity they would ultimately assign the lease. In fact, Henry True testified Bear Lodge Mountain Corporation and True Land and Royalty Company operated just like any other lease broker. The companies acquired leases and then in turn assigned them to some other entity interested in exploration and production. He also testified the

oil and gas leases could have been transferred to any one of the Trues' exploration and production companies or *to a third party*. We believe this evidence is sufficient to create a genuine issue as to whether the Trues purchased the leases intending from the outset to ultimately transfer them to True Oil Company or Smokey Oil Company. Therefore, to the extent the district court rested its decision on an end result analysis, we find summary judgment inappropriate.

Examination of the oil and gas lease transactions under the interdependence test also undermines the district court 's ruling. The record indicates the steps of the oil and gas lease transactions bear some indicia of independent economic significance. For example, it was entirely normal for Bear Lodge Mountain Corporation and True Land and Royalty Company to acquire the oil and gas leases. The Trues organized both entities for that purpose. The assignment of the leases from the brokerage entities to True Oil Company and Smokey Oil Company also falls within the realm of objective business activity we would expect to see between the parties. Neither Bear Lodge Mountain Corporation nor True Land and Royalty Company engaged in the production of oil and gas, but instead planned from the beginning of every lease acquisition to assign their interest in oil and gas leases to other oil and gas production companies. True Oil Company

and Smokey Oil Company, on the other hand, were in the business of oil and gas production and exploration, so it was natural for them to acquire interests in oil and gas leases from Bear Lodge Mountain Corporation and True Land and Royalty Company just as they would from another lease broker.

Viewing the evidence in the light most favorable to the Trues as the non-moving party, as we must, we conclude the question of whether the Trues intended from the outset to use Bear Lodge Mountain Corporation and True Land and Royalty Company solely as conduits to facilitate the transfer of the oil and gas leases to True Oil Company and Smokey Oil Company remains a disputed issue of material fact. Such questions are inappropriate for resolution through summary judgment.[15] *See Anderson*, 477 U.S. at 249 ("at the summary judgment

---

[15] The district court points out a variety of facts that cast suspicion on the substance of the oil and gas lease transactions. For example, Bear Lodge Mountain Corporation and True Land and Royalty Company had no employees of their own. Employees of True Oil Company or independent landmen paid by True Oil Company actually performed all of the preliminary work in identifying attractive leases and negotiating their acquisition. However, the record further indicates Bear Lodge Mountain Corporation and True Land and Royalty Company each paid a $250 monthly fee to True Oil Company for its services. The district court notes that if True Oil Company performed or paid for all the work associated with acquiring the leases, then "no economic rationale would justify [its] expenditure of amounts greater than the actual lease costs in order to obtain the leases" through Bear Lodge Mountain Corporation and True Land and Royalty Company . We agree. Nevertheless, the evidence before the court is not so one-sided as to apply the step transaction doctrine as a matter of law.

stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"). Consequently, we reverse the district court's award of summary judgment on this issue and remand for further proceedings consistent with this opinion.

III.    Conclusion

We affirm the district court's award of summary judgment on the question of the ranchland transactions. The ranchland transactions fail both the end result and interdependence tests. Although the Trues introduced some evidence of business purposes and economic effects pertaining to those transactions, the facts plainly demonstrate they intended to accomplish through the series of steps the particular end result of placing the ranchlands in the hands of True Ranches . In addition, the clear interdependence and lack of independent justification for the individual steps of the ranchland transactions warrants application of the step transaction doctrine. However, with regard to the oil and gas lease transactions, we find the district court improvidently granted summary judgment. We believe the question of whether the Trues intended from the outset to accomplish the end result of transferring the oil and gas leases to True Oil Company or Smokey Oil Company remains a disputed issue of material fact. Moreover, the individual steps involved in the oil and gas lease transactions do not reflect the degree of

interdependence necessary to apply the step transaction doctrine as a matter of law. Finally, we decline to consider whether the collateral estoppel doctrine applies to the oil and gas lease transactions involved in this case because the Trues failed to raise the issue in their administrative claim for refund.

Accordingly, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings consistent with this opinion.